**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

RYOKO CUNNINGHAM,

         Petitioner,

                                      Case No. 3:16-cv-1349-J-34JBT

vs.

TERRANCE CUNNINGHAM and
GLENDA CUNNINGHAM,

         Respondents.

_____/

# O R D E R

    **THIS CAUSE** comes before the Court on the Verified Petition for the Return of Minor

Child Pursuant to International Treaty and Federal Statute and Request for Issuance of

Show Cause Order (Doc. 1; Verified Petition), filed on October 26, 2016.  Petitioner filed

the Verified Petition pursuant to The Convention on the Civil Aspects of International Child

Abduction ("the Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11670, as implemented

by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001, et seq.[1]

In the Verified Petition, Ryoko Cunningham (the Mother), a citizen and resident of Japan,

requests the return of her child, Y.L.C. (the Child), from the United States to Japan.  See

Verified Petition at 2, 4.  Respondents Terrence Cunningham (the Father) and Glenda

Cunningham (the Grandmother), the father and paternal grandmother of the Child, filed an

answer to the Verified Petition on November 17, 2016.  See Answer and Defenses to

Petitioner's Verified Petition for the Return of Minor Child (Doc. 17; Answer).  At present,

the Child lives with the Grandmother in Yulee, Florida.  The Father is serving in the United

---

[1] ICARA was previously located at 42 U.S.C. § 11601.

States Army and currently stationed in Maryland, but his home of record is also Yulee, Florida.[2]  On November 23, 2016, the Court held a status conference and, after conferring with the parties, set this matter for an evidentiary hearing to be held on January 5, 2017. <u>See</u> Minute Entry (Doc. 19).  The Court began the evidentiary hearing on January 5, 2017, as scheduled and all parties appeared in person with their counsel.  <u>See</u> Minute Entry (Doc. 53).  The evidentiary hearing continued for three additional days.  <u>See</u> Minute Entries (Docs. 54, 56, 57).  Over the course of the four-day evidentiary hearing (the Hearing), the Court heard testimony from the parties, as well as several lay witnesses, and three expert witnesses.  The Court also received numerous documentary exhibits into evidence.  <u>Id.</u> Counsel for the parties submitted trial briefs and replies prior to the Hearing, and at the conclusion of the Hearing, counsel opted to present oral closing arguments rather than file post-hearing briefs.  <u>See</u> Petitioner's Trial Brief (Doc. 21) and Respondents' Trial Brief (Doc. 22), both filed December 15, 2016; Respondents' Reply Brief (Doc. 29) and Petitioner's Reply to Respondents' Trial Brief (Doc. 30), both filed December 21, 2016. Accordingly, this matter is ripe for review.

## I.      Factual Findings

The Court begins its factual findings by acknowledging that, despite having presided over a four-day evidentiary hearing, much of what transpired between the parties in this

---

[2] On October 28, 2016, at the Mother's request and pursuant to this Court's authority under 22 U.S.C. § 9004(a), the Court issued a Temporary Restraining Order (Doc. 7; TRO) prohibiting the removal of the Child from the Court's jurisdiction and requiring surrender of the Child's travel documents.  <u>See</u> TRO at 7-8. Following service of process on Respondents, the Court held a hearing on November 3, 2016, at which all parties appeared with counsel.  <u>See</u> Minute Entry (Doc. 11).  With the consent of the parties, the Court dissolved the TRO and entered a Stipulated Order imposing travel restrictions on Respondents and the Child during the pendency of this case.  <u>See</u> Stipulated Order (Doc. 12) at 2-3, entered November 3, 2016.

case remains unclear.  During the hearing, the Court found the testimony of both parents to be remarkably untruthful.  The Court makes this finding based on various factors including the Court's observation of the demeanor of the witnesses, the believability of some of their assertions, the numerous contradictions in their own testimony and statements, and the inconsistency between certain of their statements and other, more reliable or objective evidence.[3]  Also, the testimony offered by the corroborating witnesses, largely family members or prior advocates, was plainly skewed (albeit unintentionally) by their close relationship with one side or the other.  The Mother and Father's actual shared intentions at the time of these events are further obscured because it appears that the language barrier prevented this couple from communicating effectively with each other.  Thus, trying to piece together a coherent account of this chaotic relationship is, in some respects, impossible.  Nonetheless, to decide this case, the Court does not have to determine exactly what happened at each of the various points in their disputed history.  Rather, the outcome turns on two essential questions: 1) what the Mother and Father (the Parents) intended when the Mother, pregnant with the Child, left the United States in April 2015, and 2) what their agreement was when the Mother returned to the United States with the Child in October 2015.  To answer these questions, the Court, having weighed the evidence and relying on objective evidence wherever possible, makes the following factual findings.  In doing so the Court at times accepts the testimony of one parent or the other

---

[3] With respect to the Mother's testimony, the Court notes that the factual circumstances described in her Verified Petition differ in some respects from the Mother's testimony at the evidentiary hearing.  The Court notes some of these discrepancies below.

as more credible and at other times where no such determination can be made, recognizes the parents' differing accounts.

The Mother was born in Japan and has lived her entire life in Japan aside from a three week period when she attempted to live in the United States.  She has three children, an adult daughter and a teenage son, who are not related to the Father, and the eighteen-month old Child, who is the subject of these proceedings.  Prior to the Child's birth, in early 2014, the Mother was living in Okinawa with her daughter and son when she met the Father via Facebook.  The Father, an American citizen, was stationed with the Army in Okinawa at the time.  Although neither person could speak the other's language with any proficiency, a relationship developed between the two through the use of an online messenger application called "LINE" and Google Translate.  In May 2014, the couple got married in Japan and soon thereafter the Mother became pregnant.  This pregnancy ended in a miscarriage, but a few months later the Parents conceived the Child.  The Father's assignment in Japan was scheduled to end in early 2015, and his new assignment was Fort Detrick, Maryland.  Although their relationship was turbulent and troubled,[4] the Parents

---

[4] The Father accuses the Mother of being irrationally jealous, with a violent temper that sometimes culminated in physical abuse of him or her children.  He testified that while in Japan he was remanded to the Army barracks twice for his protection due to the Mother's actions.  Although he testified that he filed a report on at least one of these incidents, and the Army issued no-contact orders, he did not present these documents at the hearing, despite presenting other no-contact orders.  The Mother denies ever hitting the Father or her children, and instead, accuses the Father of being physically abusive.  Most significantly, she testified that her miscarriage in Japan occurred because the Father kicked her in the stomach.  There is no objective evidence or corroboration of either person's testimony regarding these events.

The Father's sister, Emily Conroy Cunningham, testified that she communicated with the Mother through Facebook messages, and at one point, the Mother threatened to abort this first pregnancy because she was upset with the Father.  Although presented at the hearing, these Facebook messages were never admitted into evidence, and regardless, do not necessarily support this interpretation.  As such, the Court disregards this testimony.  However, the Court notes that the Mother's testimony regarding her communication with Emily Cunningham is one example of testimony causing the Court to question her

4

nevertheless made plans to move to Maryland together, with the Mother's teenage son, and live there as a family on a permanent basis.  Accordingly, the Mother and her teenage son applied to the United States for immigrant Visas, and eventually obtained permanent resident cards.  See Resp.'s Exs. 7-10, 61.  The Mother also updated her address with the Japanese authorities to reflect her upcoming move to the United States.

On March 22, 2015, the Father, the Mother, pregnant with the Child, and her teenage son relocated to the United States.  They initially flew to Florida to visit the Father's family, and stayed for approximately a week with the Grandmother.[5]  The Father purchased a car while in Florida and the Father, Mother, and teenage son then drove to Maryland.  Once in Maryland, the Father applied for housing on the base and obtained a three-bedroom house.  Soon after settling in Maryland, the already volatile relationship between the Mother and Father deteriorated rapidly.  The Mother believed the Father was neglecting her and her son, and failing to provide them with sufficient food.  The Father was busy with work and maintains that he was providing as best he could under their tight financial circumstances.  Due to the language barrier, the Mother and her son were unable to fend for themselves and felt isolated and trapped in the home.  The Mother was also experiencing abdominal pain and, concerned for the unborn Child, wanted medical care.

---

candor.  Specifically, after initially admitting that she communicated with Emily Cunningham using Facebook, when confronted with those messages, the Mother denied the communications saying that she had not been friends with Emily Cunningham on Facebook at all.

[5] The Father asserts that they were supposed to stay in Florida for three weeks but the Mother, unhappy with the living arrangements, told the Father to choose her or his family.  He chose her which meant leaving for Maryland early and causing him to cut his leave short because he had to return to duty in order to qualify for housing.  The Mother did not address this assertion.

5

The couple argued frequently, and the Mother reached out to a domestic violence program for Asian Pacific Islanders.  See Pet.'s Ex. 35.  The Mother described her isolated and dependent situation to her case manager, including her contention that the Father was not providing enough food, and that he was physically abusive.  Id.  She also reported that she was experiencing abdominal pain and was worried about the unborn Child.  Id.[6]  Because this domestic violence program was not located near the Mother, the case manager put the Mother in touch with local services that could provide assistance.  Id.  Shortly thereafter, the Father took the Mother to the hospital as a result of her abdominal pain, where she was admitted and kept overnight.  The Mother reported to the hospital that she had been raped and that she and her son were not receiving enough food.  The next day, someone in the Father's chain of command drove the Mother home from the hospital.  The day after her release from the hospital, approximately April 11, 2015, someone in Army command drove the Mother and her son to the airport and they flew back to Japan on plane tickets funded by the Army.

According to the Father, he took the Mother to the hospital after a particularly egregious argument spurred by his late arrival home from an outing with his new co-workers.  During the argument, the Mother demanded a divorce and threatened to return to Japan.  He stated that the Mother, who was extremely angry with him, began experiencing abdominal pain, and given her previous miscarriage, he was concerned about

---

[6] The Father denies ever being physically or sexually violent with the Mother.  As noted above, he acknowledged that there was violence in the relationship, but maintained that the Mother was always the aggressor.  However, regardless of whether the Mother's allegations are true, the evidence shows the Mother did report this domestic abuse at the time and her statements played a role in her return to Japan.  See Pet.'s Exs. 35, 24.

the unborn Child so he took the Mother to the hospital.  The Father testified that the next day he had a conversation with the Mother in which she stated that she was going back to Japan, she wanted a divorce, he would never see the Child, and he would be paying alimony and child support until the Child was an adult.  The Father testified that this conversation with the Mother prompted him to seek the assistance of his command team in returning the Mother to Japan.  The Father maintained that although he did not want her to leave, he asked for the Army's assistance in helping the Mother and her son return to Japan because he was concerned about the well-being of the unborn Child in light of the apparent stress to the Mother from living in the United States.  He also stated that he received a grant from the Army Emergency Relief Fund to purchase her return tickets to Japan.  According to the Father, it was still his intention that the Child would be born and raised in the United States, and he testified that even before she left the United States to return to Japan, the Mother contacted him saying that she did not really want a divorce and begging to return.  However, it was too late for him to reverse what had been put in motion. The Mother denied that she begged to stay in the United States, and insisted that she was relieved and happy to be going back to Japan.[7]  Notably, the Father conceded that he was not privy to the Mother's conversations with his command or her conversations with the Army's Family Advocacy program.[8]  Nonetheless, whatever the Father's role may have

---

[7] The Mother corroborates that she was happy to be returning to Japan through the declaration of her domestic violence case manager who was aware of her state of mind at the time.  See Pet.'s Ex. 35.

[8] It is unclear from the record whether the Father was aware at the time that the Mother had accused him of sexually assaulting her and depriving her and her son of adequate food.

been, it is apparent the Mother's domestic violence advocate played a significant part in accomplishing the Mother's immediate return to Japan.  See Pet.'s Ex. 24.

Significantly, neither party presents any objective evidence to support their version of the highly contested events that occurred in Maryland.  For example, the parties did not provide the Court with any records from the hospitalization which precipitated the Mother's sudden departure, nor did they provide the Court with a declaration from anyone with the Army, the Army's Family Advocacy Program, or the Army Emergency Relief Fund, the entities that allegedly assisted with the Mother's return to Japan.  The Court has no records corroborating any purported "No Contact Orders" that the Amy allegedly imposed in March 2015, although Respondents did provide the "No Contact Orders" issued after the October 2015 events.  The Mother supports her version of the events in Maryland through the testimony of her Micah's Place advocate, Erika Morrison.[9]  In October of 2015, Morrison spoke with the Father's commanding officer ("command") as well as the family advocates in Maryland, and prepared notes of those conversations for the Micah's Place business records.  See Pet.'s Ex. 24.

Morrison's notes show that the Father's command was surprised and angry to learn of the Mother's return.  According to Morrison, command also stated that the Mother was not to return to the United States, but the meaning of that statement is unclear.  Moreover, based on Morrison's notes, it appears it was actually in her conversation with the domestic

---

[9] As set forth below, the Mother returned to the United States in October 2015, possibly in an attempt to reconcile with the Father. When the relationship between the two once again exploded, the Mother stayed at Micah's Place, a domestic violence shelter in Florida, for several weeks.

violence advocate, not Army command, that she learned the Mother "was not to return to the States." <u>See</u> Pet.'s Ex. 24.   In addition, Morrison testified that the Army was investigating the Father for sexual assault, but the Court has no information on the status or results of that investigation.   The notes of Morrison's conversation with the Mother's domestic violence advocate indicate that the advocate "moved heaven and earth" in April 2015 to send the Mother back to Japan as soon as possible, and the notes include a description of the domestic and sexual violence that was reported to have occurred in Maryland.   However, it is unclear whether these notes reflect the Mother's allegations at the time, or actual findings from an investigation.   Thus, the Court is left to rely in large part on the conflicting testimony of the Mother, Father and the Mother's teenage son regarding what actually occurred in Maryland.[10]

Once back in Japan, the Mother resumed living in the same apartment with her adult daughter and teenage son.   The Mother also notified the Japanese authorities of her return and updated her address on her family registry.   In April and May of 2015, the Mother worked as a driver, <u>see</u> Resp.'s Ex. 87, akin to driving for Über, and at the end of July, the Mother gave birth to the Child.   The Mother obtained a Japanese birth certificate for the Child, updated her family registry to reflect the Child's birth, and obtained a Japanese health insurance card for the Child.   <u>See</u> Pet.'s Exs. 7-10.   Bank records show that during

---

[10] According to the teenage son, he never witnessed any physical violence but does recall the Father yelling at him, yelling at the Mother in an angry voice, and acting like he was going to hit her.   The teenage son also testified that the Father did not give them enough food when they lived in Maryland.   The teenage son stated that they went back to Japan in April 2015 because the Mother had pain in her stomach, the Father did not come home, and the Father was not providing enough food.   The son thought they were returning to Japan on a permanent basis.

this time the Father transferred funds into a bank account he shared with the Mother and that someone in Japan made withdrawals and purchases from that account. <u>See</u> Resp.'s Ex. 11. In addition, at some point in time between the birth of the Child and the beginning of October, the Child obtained her United States citizenship, a United States social security card, and a United States passport. <u>See</u> Resp.'s Ex. 25. Despite the fact that the Mother participated in procuring these documents for the Child, including visiting the embassy in Japan and signing the social security card application, in Court she denied that she understood their meaning.[11]

On September 18, 2015, using the Father's credit card, the Mother purchased one-way plane tickets to travel from Japan to the United States with her teenage son and the Child. <u>See</u> Resp.'s Ex. 15. Only three days later, on September 21, 2015, the Mother exchanged text messages with the Father in which she stated she would not come back to the Father because "You no change." <u>See</u> Resp.'s Ex. 67; Pet's Ex. 13.[12] In that exchange, the Mother asked for her belongings and support, and stated that she would file for divorce. <u>Id.</u> The Father responded to the Mother's statements by repeatedly asserting "Come back to me," professing his love for her, and stating "So you angry/ So you calm down/ So come

---

[11] The Mother's denial of any understanding of the documents she obtained for the Child while still living in Japan where she would have been able to communicate with embassy officials in Japanese is not credible.

[12] During the evidentiary hearing, several witnesses were questioned about various text-message exchanges between the Mother and Father. Screen captured print-outs of these texts are located in the evidentiary record in various places, and were all admitted into evidence as part of Respondent's Exhibit 67. However, because Petitioner organized each text exchange into a separate exhibit, throughout the hearing, the parties referenced particular texts by Petitioner's exhibit number, although those exhibits were never admitted into evidence as Petitioner's exhibits. Thus, for ease of reference, the Court will cite to a particular text-message exchange using Petitioner's exhibit numbers, with the understanding that all of these messages are in evidence at Respondent's Exhibit 67.

back to me/ I will wait for you.  Airport." <u>See</u> Pet.'s Ex. 14.[13]  On September 25, 2015, the

Mother and Father had the following text message exchange:

| | |
|---|---|
| Father: | "Me alone. Tonight work. Vacation done." |
| | "Me no lie." |
| | "So sleep trying me." |
| Mother: | "I If you agree the divorce we will not return to the United States." |
| | "I If you agree the divorce we will not return to the United States." |
| | "Please freely I do not care anymore you." |
| | "Your free" |
| Father: | "See. So Ryoko wants divorce strongly?" |
| Mother: | "It is agreed." |
| Father: | "See. Ryoko wants divorce?" |
| Mother: | "You?" |
| | "You okay = me okay" |
| | "See?" |

<u>See</u> Pet.'s Ex. 15.  Although she made an effort to preserve several other text messages,

the Mother did not save any text messages reflecting the circumstances surrounding her

decision to travel to the United States.  On October 4, 2015, the Mother, teenage son, and

the Child boarded an airplane and flew to Maryland.  While in Maryland, they stayed with

the Father in the same marital home from which they had fled six months earlier.  From

Maryland, the group drove to Florida, staying in a hotel overnight along the way, to attend

the wedding of the Father's brother.  Upon their arrival, the four checked into a hotel where

other members of the Father's family were staying for the wedding.

On the morning of the wedding, Friday, October 9, 2015, the Mother, Father,

teenage son and Child visited the Grandmother's home.  Later that day, the Mother,

Grandmother and other members of the Father's family went to a nail salon together to get

---

[13] This text exchange, like the others introduced into evidence, is incomplete in that the Court has no information as to what came before or after the brief exchange captured in the screen shot.

manicures for the wedding.  Nonetheless, at some point the Mother and Father got into an argument and the Mother, her son, and the Child did not attend the wedding that evening.

In the early hours of Saturday morning, the Mother demanded to return to Japan:

> Mother:   "Come back Okinawa me"
> Father:   "See. So you fight, so go back Okinawa? Of course. Me understand"
> "You go back okinaea? [sic]"
> "Ok. You choice"
> Mother:   "Ok"

<u>See</u> Pet.'s Ex. 16.[14]  The argument continued as follows:

> Mother:   "Me no like"
> "Monday come back Okinawa me"
> Father:   "Me no like divorce talk"
> "Me no like go back Okinawa talk"
> "Me no like no listen."
> "See. You talk before, go back okinawa monday. So ok. Me no happy. But, you choice.

---

[14] The reason the Mother did not attend the wedding is disputed.  According to the Father, the Mother refused to attend the wedding because the Father, who was the best man, would be standing with the wedding party instead of sitting with her.  The Mother, when asked specifically at the hearing, testified that she and the children did not attend the wedding because the Father did not come get them from the hotel.  In this regard, despite having acknowledged attending the gathering at the Grandmother's house and the visit to the nail salon, she asserted that the Father left her and the children at the hotel all day without food.  At a different point in her testimony, the Mother stated that the Father assaulted her during their stay in Florida and there was some suggestion that the attack was the reason she did not go to the wedding and began insisting on returning to Japan immediately.  According to the Mother, the Father got angry with her in the parking lot of the hotel in Florida and choked her.  In her Verified Petition, the Mother states that the Father choked her because she asked him for a divorce.  <u>See</u> Verified Petition ¶ 29.  During the hearing, the Mother testified that the Father choked her because they could not communicate well and he got upset.  She testified that the Father later punched her thighs and sexually assaulted her in the hotel while her teenage son and the Child were asleep in the room.  The Mother reported these assaults later when she was interviewed by an investigator with the Department of Children and Families, and the investigator took photographs of bruises on the Mother's neck and thigh.  The Father denies these attacks.  <u>See</u> Pet.'s Exs. 19-20.

The Mother never specifically stated when these attacks occurred, except that they happened at the hotel, in Florida.  Notably, the Mother alleged in her Verified Petition that the Father did not stay with her at the hotel.  <u>See</u> Verified Petition ¶ 29.  The Grandmother testified that she saw a bruise on the Mother's neck on Friday and was led to believe that the bruise was a hickey.  The Father also testified that the bruise was a hickey.  Although the Court rejects any suggestion that the bruise on the Mother's neck as photographed in Petitioner's Exhibit 19 is a hickey, the truth regarding what happened in Florida cannot be determined from the evidence.  Because the Court's ultimate resolution of the matter is not contingent on this issue of fact, the Court will not resolve that question.

<div style="margin-left: 3em;">

"I love you very much."
"Good night."

Mother:   "You no hotel together"
"Ok"

Father:   "You fighting"
"Me done fighting"

Mother:   "No"

Father:   "Yes"

Mother:   "Now no fighting me"

</div>

See Pet.'s Ex. 16.  Later that morning, the Father drove to the hotel and picked up the Mother, her son, and the Child.  Although no airline tickets had been purchased, the Mother testified that she believed they were going to drive to Maryland where she would gather her belongings, and then she and her children would fly back to Japan on Monday, October 12, 2015.  The Father's text message appears to be consistent with that understanding.

Prior to leaving for Maryland, the Father drove to the Grandmother's house.  The Father went inside while the Mother and the children waited in the car.  While inside, the Father sent the Mother the following text messages:

<div style="margin-left: 3em;">

Father:   "You can't take my baby back to Okinawa"
"My baby stays with me."
"Baby says goodbye. Go home."
"No goodbye, no go home."
"Ok"
"Baby no deported."
"Baby stays with father. Baby is citizen."

</div>

See Pet.'s Ex. 17.  Although the events that transpired after this are highly disputed, at some point, the Father and Grandmother came outside and the Grandmother held the Child.  The Mother became upset, and the Grandmother handed the Child to the Father.  The Mother took the Child from the Father and began fleeing down the street to a neighbor's house with the Child and her son.

Under the Mother's version, the Father told her that unless she gave the Grandmother the baby, she could not go back to Maryland.  When the Grandmother was holding the baby, the Mother signaled that she wanted the Child back and the Grandmother turned her back to the Mother.  In light of the Father's earlier text messages, the Mother became upset and fearful that they were not going to give the Child back to her, prompting her to take the Child and flee down the street.  Under the version testified to by the Father and Grandmother, the Grandmother was holding the Child when the Mother attempted to apologize to her for not attending the wedding, but the Grandmother told the Mother she had shamed and embarrassed the family by her behavior.  The Father and Grandmother stated that the Mother became irate at these words and pushed the Grandmother.  The Grandmother then attempted to hand the Child to the Father and the Mother pushed the Grandmother again with her shoulder in an attempt to move between them.  When the Father took the Child into his arms, the Mother, enraged, beat on the Father's back, grabbed his arm, and yanked the Child by the head away from him.  The Grandmother testified that the Mother was in such a blind rage beating on the Father that she unintentionally elbowed the teenage son in his throat when he attempted to intervene.  The teenage son denied this, supported his Mother's version of events, and maintained that he never saw any physical violence that day.

Nonetheless, it is undisputed that the Grandmother called 911, and a sheriff's deputy arrived and interviewed the Father and Grandmother.  The officer was unable to communicate with the Mother despite seeking assistance of a Japanese interpreter by phone, and did not attempt to interview the son due to the language barrier.  Thus, based

14

on the statements of the Father and Grandmother, and the appearance of a faint red mark on the Father's bicep, the officer arrested the Mother for domestic battery against the Father.  Although the Father asserts that he told the officer he did not want the Mother arrested, the officer did not support this assertion.  In this regard, the officer explained that if a victim did not want an assailant arrested he would notate in his report that the victim was "not cooperative."  The officer stated that both the Father and the Grandmother were "cooperative," and the report does not include any mention of non-cooperation.  The officer took the Mother to jail and left the infant Child in the care of the Father and Grandmother. He also instructed the teenage son, by signaling with his arm, to go into the house and stay with the Father.  In the days that followed, the Father does not appear to have made any effort to assist the Mother or otherwise obtain her release.

Notably, the officer's report of the incident, and specifically his account of the Father and Grandmother's statements, describes distinctly less egregious conduct than what the Father and Grandmother testified to in Court.  See Resp.'s Exs. 13-14.  According to the report, when the Grandmother attempted to hand the Child to the Father, the Mother stepped between them and "nudg[ed]" the Grandmother with her shoulder.  See Resp.'s Ex. 14.  Both the Grandmother and the Father told the deputy that the Mother grabbed and pulled on the Father's arm and pulled the Child from his arms "very aggressively."  Id.  The report documents a "red mark" on the Father's right bicep which was too faint to photograph.  Id.  In his report, the deputy makes no mention of any allegations that the

Mother violently shoved the Grandmother, beat on the Father's back, elbowed her son in the throat, or yanked the Child by the head. Id.[15]

The officer notified the Department of Children and Families (DCF) about the incident and on October 12, 2015, Katrina Bearden, an investigator with DCF, interviewed the Mother, through an interpreter, at the Nassau County Jail. Bearden photographed a two-inch by four-inch greenish bruise on the Mother's neck, as well as a round, brown-colored bruise the size of a silver dollar on the Mother's thigh. See Pet.'s Exs. 19-20. The Mother informed Bearden that the Father had choked her and raped her, and Bearden reported these allegations to the Nassau County Sheriff's Office. See Pet.'s Ex. 20. In a letter to the public defender dated October 14, 2015, Bearden recommended that the Mother be released so she could care for the Child and her teenage son. Id. DCF arranged for the Mother to stay at a domestic violence shelter, Micah's Place, and ultimately, the state attorney's office dropped the charges against the Mother with the benefit of Bearden's recommendation. After being held in jail for four days, on approximately October 14, 2015, the Mother was released and she and her teenage son went to stay at Micah's Place. On October 15, 2015, with the assistance of staff at Micah's Place, the Mother attempted to regain physical custody of the Child by filing a Verified Petition for Emergency Child Pick-Up Order in the Circuit Court of the Fourth Judicial Circuit in Nassau County, Florida. See Pet.'s Ex. 23 (Emergency Petition). On October 16, 2015, the state court denied the

---

[15] Notably, in Court, the Father testified that he felt a pop in the Child's chest when the Mother was pulling the Child. The Court rejects this testimony. Nothing in the police report suggests that the Father indicated or believed that the Child might be injured. The police officer did not examine the child for injuries and the Father and Grandmother did not seek medical attention for the Child following the altercation.

Mother's petition but set the matter for a hearing.  Resp.'s Ex. 30.  In the same court, also on the 16th, the Father filed a Petition for Dissolution of Marriage.  Resp.'s Ex. 25.

The state court held a hearing on the Mother's Emergency Petition on October 21, 2015, and the Father, the Mother and a Japanese interpreter were present.  See Resp.'s Ex. 37.  The Father was represented by counsel at the hearing, but the Mother was not. Id.  At the hearing, in response to the court's questioning, as well as comments from opposing counsel, the Mother, through the interpreter, stated three times, under oath, that she planned on staying in the United States to raise her children and did not intend to return to Japan.  Id.[16]  However, Erika Morrison, the Mother's Micah's Place case manager,

---

[16] In her Trial Brief and at trial, the Mother argues that due to "confusion and faulty translation services," the Mother's statements, as interpreted by the translator, at the October 21, 2015 hearing, do not reflect her actual intentions.  See Petitioner's Trial Brief at 13.  It is unclear whether it is the Mother's position that the translator incorrectly translated what the Mother actually said, or whether the Mother's answers resulted from her confusion about the proceedings because she was unable to understand the translator.  The Mother presented evidence that due to her Okinawan dialect, she has difficulty communicating with some Japanese speakers.  The Mother testified that she did not understand much of the hearing, and Morrison recalled that after the hearing the Mother did not understand what the judge had decided; although Morrison was able to explain it to the Mother using the same interpreter who had interpreted the hearing.  Counsel for the Mother also argued that the transcript reflects the use of "summary" translation, as opposed to simultaneous or consecutive translation, which she maintained was inappropriate under the "Federal Interpreter's Act," and renders the translator's statements inadmissible hearsay.  See 28 U.S.C. § 1827(k).  Counsel cited the Court to United States v. Torres, 793 F.2d 436 (1st Cir. 1986), but this case and the federal statute are inapposite to counsel's contention that the Mother's translated statements, made under oath, on the record, in Florida state court proceedings, are excludable hearsay.  Nonetheless, the Court has carefully evaluated whether the translator was "summarizing" the Mother's testimony and considered that in determining what weight to give those statements.

Upon review of the transcript of the October 21, 2015 hearing, and the testimony of the witnesses to that hearing, including that of the translator, the Court is convinced that while the Mother may have been confused about some aspects of the proceedings, she did knowingly state under oath that she intended to stay in the United States with her children.  The Mother's suggestion that she was unable to communicate with the interpreter is not credible and is belied by the fact that the answers and statements made by the Mother through the interpreter accurately reflect facts and contentions of the Mother that the interpreter could not have known but for her ability to communicate with the Mother.  Indeed, Morrison testified that the Mother may have been saying what she thought others wanted to hear.  Thus, the Court rejects the contention that the statements reflected in the state court transcript do not accurately reflect what the Mother stated was her intention at that time or that they are a result of a failure of communication.  However, the Court does not consider these statements definitive evidence of the Mother's settled intent to move to the United States permanently.  Instead, the Court considers these statements in the context in which they were made—a

testified that she was present at the hearing and was surprised by these statements because they were inconsistent with what the Mother had previously told her.  According to Morrison, the Mother had consistently wanted to know when she could go back to Japan. Notably, in the Mother's Emergency Petition, dated October 15, 2015, with which Morrison assisted, the Mother stated that she brought the Child to the United States "for a visit."  See Pet.'s Ex. 23.  Likewise, in her interview with DCF on October 12, 2015, the Mother told Bearden that she had returned to the United States to allow the Father to meet their daughter, and that after her arrival the Father told her that the Child was "his kid," he was going to give custody of the Child to his mother, and the Child would not be leaving the United States.  See Pet.'s Ex. 20.

At the conclusion of the October 21, 2015 hearing, the state court directed that the Father would retain the Child's passport and ordered that the Child not leave the jurisdiction of the court.  The judge further determined, on a temporary basis, that the Child must be returned to the Mother, but allowed substantial visitation for the Father.  When the Father informed the Court that he must return to Maryland due to his obligations with the Army, the judge directed that the Grandmother would exercise visitation.  See Resp.'s Ex. 38. Pursuant to the state court's order, the Mother regained physical custody of the Child that evening.  However, the Mother's physical custody of the Child was short-lived.  On October 26, 2015, the Father's counsel filed an Emergency Motion to Transfer Temporary Custody of the Minor Child in which she requested that the Child be placed with the Grandmother

---

hearing at which the Mother having had her Child taken from her by police and been jailed for four days in a foreign land is attempting to regain at least temporary custody of her baby—and in light of all the other evidence of the Mother's intent.

due to communication problems that had arisen with Micah's Place and the failure of the Child to attend a scheduled doctor's appointment.  <u>See</u> Resp.'s Ex. 40.  The state court granted the request on October 27, 2015, and set the matter for a hearing on November 2, 2015.  <u>See</u> Resp.'s Ex. 41.  The Grandmother took physical custody of the Child on October 28, 2015.  The Mother appeared with counsel and a translator at the hearing on November 2, 2015, but after hearing testimony from the Father's counsel and the Mother, the judge determined that the Child would remain with the Grandmother.  <u>See</u> Resp.'s Exs. 47, 53. The judge did allow the Mother to exercise visitation with the Child, so long as it was supervised, and did not occur at Micah's Place.  <u>See</u> Resp.'s Ex. 53.  The Mother exercised this visitation.

While staying in the shelter, the Mother learned of the Hague Convention, and through Japanese counsel, on November 30, 2015, the Mother filed an Application for Assistance in the Child's Return with the Japanese Central Authority.  <u>See</u> Resp.'s Ex. 67 (Hague Application).  On December 12, 2015, the Mother and her teenage son flew back to Japan without notifying the Father, Grandmother, or her own legal counsel.[17]   The Mother returned to Japan after learning that her twin brother was involved in a serious accident, which ultimately led to his death.  After she returned to Japan, the Mother did not have any contact with the Child and neither the Father nor the Grandmother heard from her.  Nor did the Father attempt to contact the Mother.[18]   Although recognizing that the

---

[17] Although she was able to reside at Micah's Place at no cost and was receiving court ordered monetary support from the Father of $1,000 per month, the Mother stated in the Verified Petition that she returned to Japan because she ran out of money.  <u>See</u> Verified Petition ¶ 84; <u>see also</u> Resp.'s Ex. 67.

[18] The Army had ordered the Father to have no contact with the Mother effective October 14, 2015, <u>see</u> Resp.'s Ex. 83, but that order was rescinded on April 8, 2016, <u>see</u> Resp.'s Ex. 82.

Child was too young to effectively communicate, the Court notes that despite listing the Father and Grandmother's addresses and phone numbers in her Hague Application, the Mother testified in Court that she did not contact the Child because she did not know their numbers or addresses.  On February 11, 2016, the state court entered a Default Final Judgment of Dissolution of Marriage which dissolved the marriage between the Mother and Father, and gave the Father sole parental responsibility and custody of the Child.  <u>See</u> Resp.'s Ex. 78.  The Mother filed a Japanese complaint for divorce on February 16, 2016.  <u>See</u> Resp.'s Ex. 81.

## II.   Prima Facie Case

### A.  Applicable Law

The purpose of the Hague Convention is "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access."  <u>See</u> Convention, pmbl.  "The Convention generally intends to restore the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic court for custody hearings."  <u>See</u> <u>Hanley v. Roy</u>, 485 F.3d 641, 644 (11th Cir. 2007).  As such, "[t]he court's inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle."  <u>See</u> <u>Ruiz v. Tenorio</u>, 392 F.3d 1247, 1250 (11th Cir. 2004).[19]  The Hague Convention "applies to children under sixteen years of age

---

[19] To the extent Respondents contend that this case does not fall within the Hague Convention because Respondents effectuated the purportedly wrongful retention by means of a state custody decision and Petitioner could have availed herself of that process, such an argument is without merit.  <u>See</u> <u>Holder v. Holder</u>, 305 F.3d 854, 865-66 (9th Cir. 2002) ("It would also undermine the very scheme created by the Hague Convention and ICARA to hold that a Hague Convention claim is barred by a state court <u>custody</u>

who are 'habitually resident' in a contracting state (Convention, Art. 4) and are 'wrongfully removed' to another contracting state (Convention, Art. 1)." <u>Seaman v. Peterson</u>, 766 F.3d 1252, 1257 (11th Cir. 2014).[20]  A removal is "wrongful" within the meaning of the Hague Convention where:

> a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in sub-paragraph a above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

<u>See</u> Convention, Art. 3.    The petitioner bears the burden of establishing by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention."  <u>See</u> 22 U.S.C. § 9003(e)(1)(A).  If a petitioner establishes a wrongful removal or retention, then "the authority concerned shall order the return of the child forthwith," unless the respondent establishes one of the affirmative defenses enumerated in the Convention.  <u>See</u> Convention, Art. 12; <u>see</u> <u>also</u> <u>Baran v. Beaty</u>, 526 F.3d 1340, 1344 (11th Cir. 2008).

---

determination, simply because a petitioner did not raise his <u>Hague Convention</u> claim in the initial custody proceeding."); <u>Nicolson v. Pappalardo</u>, 605 F.3d 100, 106-08 (1st Cir. 2010); Hague Convention, art. 17 ("The sole fact that a decision relating to custody has been given in or is entitled to recognition in the requested State shall not be a ground for refusing to return a child under this Convention . . . ."); <u>see</u> <u>also</u> <u>Walker v. Walker</u>, 701 F.3d 1110, 1116-17 (7th Cir. 2012); <u>Mozes v. Mozes</u>, 239 F.3d 1067, 1085 n. 55 (9th Cir. 2001).

[20] It is undisputed that both the United States and Japan are contracting states to the Hague Convention.

To prevail on her Petition, the Mother must prove that: (1) the Child was "habitually resident" in Japan at the time Respondents retained her in the United States; (2) the retention was in breach of the Mother's custody rights under Japanese law, and (3) she had been exercising those rights at the time of retention.  See Ruiz, 392 F.3d at 1251.  The parties do not dispute that the Mother had custody rights and was exercising those rights.  Nonetheless, Respondents contend that the Mother cannot satisfy her prima facie case because Japan is not the Child's habitual residence.  In addition, Respondents maintain that, under Japanese law, their retention of the Child did not breach the Mother's custody rights.  For the reasons set forth below, the Court determines that the Mother has satisfied her prima facie case.

### B.  Analysis

#### i.  Habitual Residence

Neither the Hague Convention nor ICARA define the term "habitual residence."  See Ruiz v. Tenorio, 392 F.3d 1247, 1252 (11th Cir. 2004).  Indeed, this term is intended to be free from "'technical rules, which can produce rigidity and inconsistencies as between legal systems.'"  See id. (quoting In re Bates, No. CA 122.89 at 9-10, High Court of Justice, Fam.Div'n Ct. Royal Court of Justice, United Kingdom (1989)).  Generally, a habitual residence requires only that "'the purpose of living where one does has a sufficient degree of continuity to be properly described as settled.'"  Id.  Recognizing the limited usefulness of such generalities, the Eleventh Circuit has adopted the approach set forth by the Ninth Circuit in Mozes v. Mozes, 239 F.3d 1067 (9th Cir. 2001) for determining a child's habitual residence.  See Ruiz, 392 F.3d at 1252.  According to Ruiz and Mozes, "[t]he first step

22

toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind."  Id. (citing Mozes, 239 F.3d at 1075).  Significantly, it is "'the person or persons entitled to fix the place of the child's residence'" whose intention or purpose must be considered.  Id. at 1253 (quoting Mozes, 239 F.3d at 1076).  However, "when the persons entitled to fix the child's residence do not agree on where it has been fixed," as in this case, the analysis is more difficult.  Id.  The courts discussed three different factual scenarios in which such a disagreement may arise, and observed that the more difficult cases occur where the parents agreed to a child's stay abroad for a period of ambiguous duration.  Id.  In such cases, the courts reasoned:

> "Sometimes the circumstances surrounding the child's stay are such that despite the lack of perfect consensus, the court finds the parents to have shared a settled mutual intent that the stay last indefinitely.  When this is the case, we can reasonably infer a mutual abandonment of the child's prior habitual residence.  Other times, however, circumstances are such that, even though the exact length of the stay was left open to negotiation, the court is able to find no settled mutual intent from which such abandonment can be inferred."

Id. (quoting Mozes, 239 F.3d at 1077-78).

However, while crucial, the settled intention of the parents alone cannot transform the habitual residence.  Id.  Instead, there must also be "an actual change in geography and the passage of a sufficient length of time for the child to have become acclimatized."  Id.  Nonetheless, where parental intent is uncertain or contrary, courts must be "slow to infer" a change in habitual residence based on the level of a child's contact with the new country, such as in school or with friends.  Id. at 1253-54.  Because children can be "remarkably adaptable," the significance of such contacts is difficult to discern and "'[t]he greater the ease with which habitual residence may be shifted without the consent of both

parents, the greater the incentive to try.'" Id. at 1254 (quoting Mozes, 239 F.3d at 1079).

Last, the Ruiz and Mozes cases instruct that:

> when there is no shared settled intent on the part of the parents to abandon the child's prior habitual residence, a court should find a change in habitual residence if the objective facts point unequivocally to a new habitual residence, or if the court could "say with confidence that the child's relative attachments to the two countries have changed to the point where requiring a return to the original forum would now be tantamount to taking the child out of the family and social environment in which its life has developed."

Id. at 1254 (quoting Mozes, 239 F.3d at 1081).

The difficulty with applying the foregoing analysis in this case, however, is that Ruiz and Mozes are focused on situations in which a child's habitual residence has changed, as opposed to the question of when or how an infant's initial habitual residence is first established. See Nicolson v. Pappalardo, 605 F.3d 100, 104 (1st Cir. 2010) (stating that the court was "not concerned" with the standards for evaluating a change in habitual residence where respondent argued only that the child never formed an initial habitual residence). Indeed, "[t]his case . . . presents the unique question of whether and when a very young infant acquires an habitual residence," and is thus different from the more typical case where "the child is assumed to have an habitual residence initially and the controversy is over a change of that residence." See Delvoye v. Lee, 329 F.3d 330, 333 (3d Cir. 2003). Significantly, "courts have consistently held that a newborn's place of birth does not automatically bestow upon that child a habitual residence." See McKie v. Jude, No. 10-103-DLB, 2011 WL 53058, at *10 (E.D. Ky. Jan. 7, 2011) (citing Holder v. Holder, 392 F.3d 1009, 1020 (9th Cir. 2004) and Delvoye, 329 F.3d at 334); see also Uzoh v. Uzoh, No. 11-cv-09124, 2012 WL 1565345, at *5 (N.D. Ill. May 2, 2012) (citing Kijowska v. Haines,

463 F.3d 583, 587 (7th Cir. 2006)).  Moreover, an infant child's habitual residence is not automatically that of her mother.  See Delvoye, 329 F.3d at 333; In re A.L.C., 607 F. App'x 658, 662 (9th Cir. 2015); Kijowska, 463 F.3d at 587 (7th Cir. 2006); see also Nunez-Escudero v. Tice-Menley, 58 F.3d 374, 379 (8th Cir. 1995).  Thus, although the Mother in this action devoted a significant portion of her case to proving that the October 2015 trip to the United States did not change the Child's habitual residence, the Court must first determine whether she established by a preponderance of the evidence that Japan was the Child's habitual residence to begin with, a point the Father does not concede.  The Father contends that the Child's habitual residence is the United States because when the couple moved to the United States in April 2015, they shared a mutual intent to remain permanently in the United States.  According to the Father, even after the Mother returned to Japan, they quickly reconciled and prior to the Child's birth agreed that as soon as the Mother and Child were able to travel, they would come to the United States to live here permanently.  The Mother disputes this, saying that she wanted a divorce from the Father and only came to the United States to allow him to meet the Child.  Having considered all of the evidence and arguments, the Court concludes that the preponderance of the evidence establishes that Japan is the Child's habitual residence.

Turning to the analysis set forth in Ruiz, the Court first dispenses with acclimatization as a useful factor in this case.  As several circuit courts have recognized, in cases involving very young children, "'[a]cclimatization is an ineffectual standard by which to judge habitual residence in such circumstances because the child lacks the ability to truly acclimatize to a new environment.'"  See Redmond v. Redmond, 724 F.3d 729, 746

(7th Cir. 2013) (quoting <u>Karkkainen v. Kovalchuk</u>, 445 F.3d 280, 287 (3d Cir. 2006)); <u>Holder v. Holder</u>, 392 F.3d 1009, 1020-21 (9th Cir. 2004) ("[I]t is practically impossible for a newborn child, who is entirely dependent on its parents, to acclimatize independent of the immediate home environment of the parents."); <u>Simcox v. Simcox</u>, 511 F.3d 594, 602 n. 2 (6th Cir. 2007) (acknowledging that considering the acclimatization of a child to determine habitual residence "may not be appropriate in cases involving infants or other very young children"). Rather, when a child is very young "acclimatization is not nearly as important as the settled purpose and shared intent of the child's parents in choosing a particular habitual residence." <u>See</u> <u>Whiting v. Krassner</u>, 391 F.3d 540, 550 (3d Cir. 2004). Accordingly, the Court turns to the question of parental intent.

Like acclimatization, under the circumstances of this case, a focus on parental intent is also problematic. Here, the Parents, although still married, had separated and were living in different countries at the time of the Child's birth. Nonetheless, the Court considers the testimony of the Parents and the objective facts to determine whether, despite the breakdown of their relationship, the Parents, at some point, shared a settled mutual intent on where the Child would reside. It is undisputed that the Parents both planned to live together as a family in the United States when they moved here in March 2015. However, the problems that plagued their relationship in Japan followed them to the United States and the situation rapidly deteriorated. After no more than three weeks in the United States, in a whirlwind of tempers and abuse allegations, the Mother and her teenage son returned to Japan with the Army's assistance. Although it is disputed who obtained the Army's help in facilitating the Mother's departure, the Father readily acknowledges that he consented

to the Mother's return to Japan.  Indeed, the Father testified that he asked the Army to assist him in getting the Mother back to Japan.

In determining whether the Child's habitual residence was Japan at the time of her birth, the Court finds the Father's testimony in this regard to be significant.  The Father unequivocally testified that upon hearing the Mother's demand to return to Japan and obtain a divorce, and further, hearing her threat to never let him see the Child, his response was to ask the Army for assistance in returning the Mother to Japan.  Thus, whatever his hopes had been for their future in Maryland, at that point, the Father acquiesced in the Mother's decision to leave him and return to Japan while pregnant with the Child.  Although the Father testified that he still intended for the Child to be born and raised in the United States, the Court rejects this testimony because, under the circumstances, the Father could have had no reasonable expectation that the Mother and Child would be returning to the United States.  Indeed, in light of the fraught circumstances in which the Mother left, the family's limited finances, and the stage of the Mother's pregnancy, it strains credulity to suggest that the Father thought the Mother and her teenage son would be returning to the United States before the birth of the Child in July.  Moreover, absent convincing her to reconcile, the Father had no means by which to ensure that the Mother would ever return. Notably, those involved with the Mother's departure, the Army command and the domestic violence counselor, had no expectation that she would return to the United States.  Thus, while one or both Parents may have had mixed feelings about the Mother's departure, they both shared a settled mutual intent that she would return to Japan, pregnant with the unborn Child, indefinitely.  See Ruiz, 392 F.3d at 1253.

Thus, the Court turns to the next critical issue in determining habitual residence: what were the Parents' intentions when the Mother returned to the United States with the Child in October 2015.  The Father maintained that the parties continued communicating after the Mother returned to Japan and soon reconciled.  According to the Father, even prior to the Child's birth they developed a plan for the Mother, teenage son, and Child to return to the United States as soon as the Mother and Child were able to travel.  The Mother denied that there was ever a reconciliation.  According to the Mother, when she returned to Japan she had no further communications with the Father until after the Child was born. The Mother testified that although she notified the Father of the Child's birth, he did not respond, and she did not hear from him until some period of time later.  The Mother insisted that she had told the Father she wanted a divorce and the purpose in coming to the United States was to allow the Father to meet the Child, but that she never intended to remain here permanently.  The Court finds neither Parents' description of the October 2015 trip to be entirely credible.  For the reasons set forth below, the Court finds by a preponderance of the evidence that at most the Mother traveled to the United States in October 2015 in an attempt to reconcile with the Father.  In doing so, the Court rejects the Father's contention that any such reconciliation was a full reconciliation with definite plans to settle in the United States.

The Mother's insistence that the Father and she ceased communicating after she returned to Japan is belied to some extent by the Father's bank records.  The Father transferred $4,000 to the Parents' shared bank account three days after the birth of the

28

Child.[21]  See Resp.'s Ex. 11.  The records further establish that the Mother withdrew the entire $4,000 three days later.  See Resp.'s Ex. 84.  In addition, these bank records show additional transfers from the Father into this account following the Child's birth and throughout the month of August in amounts of $200, $60.13, $79.57, and $100.  See Resp.'s Ex. 11.  The transaction history shows numerous debits to this account from someone using a Visa check card to make purchases in Japan, and the same check card was used to make purchases from the Army and Air Force Exchange Service.  Id.  Another entry reflects that someone in Japan withdrew $100 from the bank account on August 8, 2015.  Id.  This evidence corroborates the Father's testimony that he remained in contact with the Mother at least following the Child's birth, and continued to send her money and support for their Child, and undermines the Mother's statements regarding the status of her relationship with the Father immediately following the Child's birth.[22]

The Mother also argues that her actions upon returning to Japan indicate that she had no intention of reconciling with the Father.  Specifically, when she returned to Japan she resumed living in her prior apartment, obtained a job, registered her new address with the Japanese authorities, and after the Child's birth, registered the Child and obtained a Japanese health insurance card for her.  However, upon closer examination, the Court finds that these actions do not rule out the possibility that the Mother was still considering

---

[21] According to the Father, he sent this money to the Mother to cover the medical expenses related to the birth of the Child, and had to take out a loan in order to obtain the $4,000.

[22] Notably, Erika Morrison testified that she reviewed the string of text messages between the Father and the Mother that went back "for months" and included his pleas that she attend the wedding and requests that the Mother send photos of herself.  Morrison testified that the Mother did not respond to the requests for photographs.

a possible reconciliation with the Father.  When the Mother returned to Japan, she resumed living in the apartment owned by her uncle and shared with her adult daughter, under the same lease agreement she had executed prior to the March 2015 departure from Japan. She worked for a month or two "on call" as a "substitute driver," which she testified was akin to driving for Über.  <u>See</u> Resp.'s Ex. 87.  Although the Mother did register the Child on the family registry with a Japanese address and obtain a Japanese health insurance card for the Child, the Child also obtained her United States citizenship, United States social security number, and United States passport, all while living in Japan.  The Mother's signature is on the Child's application for a Social Security Card, dated September 2, 2015, <u>see</u> Resp.'s Ex. 25, and the Father's unrebutted testimony is that the Mother assisted in securing these items for the Child, including a visit to the United States Embassy in Japan. As such, the objective evidence regarding the Mother's actions in obtaining official documentation from both countries for the Child following her birth is at best equivocal as to the Mother's ultimate intentions regarding a move to the United States.

　　The Court also views the Mother's return trip to the United States so very soon after the birth of the Child as indicative of a willingness to consider reconciliation.  Although the Mother testified that she came to the United States solely to allow the Father to meet the Child, the circumstances of the trip suggest otherwise.  Under the Mother's version of these events, having asked the Father for a divorce, she traveled halfway around the globe with her teenage son and a two-month old infant to allow her purportedly abusive, estranged husband to meet his newborn daughter.  But if the purpose of the trip was only to allow the Father to meet the Child, why not insist that he travel to Japan?  Indeed, in her Verified

Petition the Mother asserts that the Father had a three-week leave following the birth of the Child which he did not use to see the Child, <u>see</u> Verified Petition ¶ 24, so then why would she undertake the journey for his benefit?  Why bring the teenage son who could have stayed home with his adult half-sister? Why would the Mother agree to an itinerary that included a lengthy, overnight road trip from Maryland to Florida in a car with her estranged husband?  Why would she plan this trip so as to attend the wedding of the brother of her allegedly abusive husband from whom she wants a divorce?  These circumstances indicate that the nature of this trip was more than a mere visit to allow the Father to meet the Child, and included at least the possibility of reconciliation.  Indeed, when the Court directly asked the Mother why she came back, her response indicated that part of the reason was the Father's persistence in begging her to return, declarations of love for her, and his statement that he would wait for her at the airport.[23]  Although she testified that the Father promised her she could go back to Japan, she conceded that prior to the trip she and the Father never discussed when she would return.[24]

Nonetheless, the Court also rejects the Father's contention that the Parents had fully reconciled and agreed on a permanent move to the United States.  Based on the evidence, it is the Court's view that any reconciliation between these two individuals was

---

[23] Text messages between the parties in late September of 2015 show the Father begging the Mother to return to him and declaring his love for her, not insisting that he wanted to meet the Child.

[24] The Court notes that the Mother traveled to the United States in October 2015 on one-way tickets that she purchased in mid-September, roughly a month and a half after the Child's birth, using the Father's credit card. According to the Mother, she purchased one-way tickets because the Father instructed her that there was only enough money for those tickets at the time, and that he would give her money for the return flight later.  As such, the Court places little weight on the use of one-way tickets.

always tentative and the Mother never formed a "settled" intention to abandon Japan. Indeed, shortly after the Mother purchased the plane tickets for the October trip, she exchanged text messages with the Father stating that she would not come back to him because "you no change," and demanding a divorce.[25] She either comes to the United States still intending to divorce him or changes her mind and comes to try a reconciliation, but less than a week after arriving in the United States, she is insisting on returning to Japan immediately. Notably, unlike when she moved to the United States in March 2015 with the intent to remain indefinitely, the Mother did not change her address with the Japanese authorities prior to the October 2015 trip.[26] The Court is convinced that the Mother came to the United States in October 2015 with at most an intent to explore the possibility of reconciling with the Father, and with every intention of returning to Japan with

---

[25] To the extent the Mother relies on these texts as evidence that she had no intent to attempt a reconciliation when she came to the United States, the Court is not persuaded. While the Mother saved select text message exchanges with the Father documenting her fights with him, notably absent from these records are the text messages where the Mother agreed to come to the United States, where the Parents formed the plan for the trip, or messages immediately preceding her departure from Japan. Given that the language barrier between these individuals likely would have prevented them from having these discussions orally over the telephone, such text messages almost certainly existed.

    The Court notes that the Father's great-grandmother testified that she observed Facebook messages posted by the Mother on the Father's Facebook page after the birth of the Child. According to the great-grandmother, in these messages, as translated by Facebook, the Mother expressed that she was packing and counting down the days until she came to the United States. While the Court questioned the admissibility of this testimony, even if the Court considers this evidence, it does not change the Court's view that the Mother's feelings about the Father were constantly in flux and that, while perhaps considering reconciliation, she did not have a settled intent to abandon Japan.

[26] The Mother relies on her Japanese lease agreement and utility bills as evidence that she always intended to return to Japan, but the Court does not find this evidence to be persuasive under the circumstances. The Mother executed the two-year lease agreement in January 2014, prior to even the March 2015 "permanent" move to the United States. Moreover, the Mother's adult daughter continued to live in that apartment during both of the Mother's trips to the United States. As such, the existence of the lease and utility bills are not persuasive evidence regarding the Mother's long-term plans.

her children at the first sign of trouble.[27]  Likewise, despite the Father's insistence that their reconciliation and the Mother's permanent relocation was a settled matter, the Court finds that given the volatile history of their relationship, as well as the Mother's ongoing discussion of divorce, the Father could not have believed that any such reconciliation was anything but tentative and fragile.

While it is doubtful that this couple ever expressly discussed what would happen if the attempted reconciliation attempt did not work, the preponderance of the evidence establishes that both Parents understood that absent reconciliation, the Mother and Child would return to Japan.  It is undisputed that due to the Father's employment, he would be unable to care for the Child on his own, and thus, could not have had any expectation that he would keep the Child in the event his relationship with the Mother broke down.[28]  Although the Grandmother is serving as the Child's caretaker now, she testified that prior to the chaotic events of October 10, 2015, she was unaware that the Mother had asked for a divorce or wanted to return to Japan.  As such, the Father could not have discussed whether the Grandmother would be willing to care for the Child until just before the Mother's

---

[27] The Court acknowledges that the Mother's teenage son testified to his belief that the trip to the United States was not permanent.  However, he also stated that the reason for the trip was to attend a family wedding.  In the Court's view, the teenage son's belief that the trip was not permanent is not necessarily inconsistent with the Court's finding that the Mother planned to return to Japan if things did not work out.

[28] The Father testified that he currently works a "cyclical shift schedule," with work days lasting between fourteen and sixteen hours.  According to the Father, over a seven day period, he works from 5:00 a.m. to 7:00 p.m. for two days, then 5:00 p.m. to 7:00 a.m. for two days, followed by a day off, and then two days where he is on-call to work at any point day or night.  The Father began this work schedule in November of 2015.  Although the Court does not know the particulars of the Father's work schedule in September and October of 2015, the history of the relationship between the Father and the Mother indicates that the Father has consistently worked long and erratic hours.  Notably, at the October 21, 2015 hearing in state court, the Father informed that judge that while he would like to take the Child to Maryland, his work schedule at the time would make it difficult for him to care for the Child.  See Resp.'s Ex. 37.

arrest.  In addition, the Father's text message exchange with the Mother on October 10, 2015, demonstrates that he understood and had accepted that the Mother would return to Japan with the Child if reconciliation failed.  In two exchanges the Father responded to the Mother's demand to return to Okinawa with "you choice."  Although the Father testified that he did not mean by this response that she could leave with the Child, given the age of the Child, his failure to mention the Child, and the Mother's role up to that point as the Child's primary caretaker, the Court rejects this strained interpretation.

Most significantly, the Court finds that the events of October 10, 2015, show that the Father's decision to keep the Child in the United States was a sudden departure from the Parents' prior understanding.  After agreeing that it was her choice whether to return to Japan, the Father changes position and tells the Mother, at his last possible opportunity, that she cannot take the Child.  The timing and tone of these messages, and the Mother's panicked reaction to them, indicate that his statements were contrary to their prior understanding.  Specifically, in the early morning hours of October 10, 2015, the Father definitively states: "See. You talk before, go back Okinawa Monday. So ok. Me no happy. But, you choice. I love you very much. Good night."  Yet, shortly before they were to leave for Maryland and after conferring with the Grandmother, the Father suddenly tells the Mother that she cannot take the Child back to Okinawa, and that the Child must stay with him.  The Mother's terrified reaction to these texts, specifically grabbing the Child and fleeing down the street, convince the Court that this was the first time the Father had expressed any intention of keeping the Child in the United States, or otherwise informed the Mother that he would not agree to let her take the Child back to Japan.  This series of

events shows that after the Father's hopes of reconciliation ended, the Father discussed the matter with the Grandmother, and only then developed the idea of keeping the Child in the United States.

Based on the foregoing, the Court rejects the Father's contention that the United States is the Child's country of habitual residence, and finds that the Mother has established by a preponderance of the evidence that the Child was habitually resident in Japan prior to the retention.  While the Parents' may have agreed to live permanently in the United States prior to the Child's birth, this arrangement ended months before the Child was born.  The Mother, pregnant with the Child, and with the Father's consent, had abandoned the United States.  Indeed, the Father agreed to, and by his own testimony, facilitated the Mother's return to Japan, fully aware of her threats to divorce him and never let him see the Child.  Although the Father may not have been happy with this turn of events, he nonetheless agreed to her departure and did so without any reasonable expectation that the Mother would ever return with the Child.  Thus, at that point, although perhaps lacking perfect consensus, the Parents had a settled mutual intent that the Child would stay in Japan indefinitely.  See Ruiz, 392 F.3d at 1253.  While the Parents later began entertaining the idea of a reconciliation in the United States, the relationship was unstable and they both anticipated that absent a successful reconciliation, the Child and Mother would return to Japan.  Significantly, this is not a case where one parent held private, unexpressed, reservations about a move.  See Ruiz, 392 F.3d at 1257 (distinguishing Feder v. Evans-Feder, 63 F.3d 217 (3d Cir. 1995) where it was unclear whether or when the mother expressed her private reservations about the move).  The

35

Father was well aware of the Mother's requests for divorce, her mercurial feelings, and her overall uncertainty about their marriage.  Because the Father agreed to let the Mother return to Japan under the circumstances described above, and merely persuaded her to attempt a reconciliation in the United States with the understanding that she would return to Japan with the Child if it did not work out, the Court concludes that the Child's habitual residence is Japan, and the Parents' intentions regarding the October 2015 trip were in no way sufficiently "settled" to amount to a change in habitual residence.

### ii. Wrongful Retention

Respondents maintain that even if the Child's habitual residence is Japan, Petitioner cannot satisfy her prima facie burden to show a wrongful retention.  As stated above, Article 3 of the Hague Convention specifies that a retention is wrongful where:

> a) it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the . . . retention; and
> b) at the time of . . . retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the . . . retention.

Hague Convention, art. 3.  It is the Mother's burden to establish a wrongful retention by a preponderance of the evidence.  See 22 U.S.C. § 9003(e)(1)(A).  The Convention broadly defines "rights of custody" as "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."  Hague Convention, art. 5. The Perez-Vera Report[29] on the Hague Convention explains that: "[t]hose relationships

---

[29] As the official reporter of the Hague Conference, Elisa Perez-Vera's report is recognized "'as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention.'"  See Gomez v. Fuenmayor, 812 F.3d 1005, 1012 n.1 (11th Cir. 2016) (quoting Ruiz v. Tenorio, 392 F.3d 1247, 1252 n.2 (11th Cir. 2004)).  Indeed, "'[b]ecause a treaty ratified by the United States is not only the law of this land . . . , but also an agreement among sovereign powers, [courts] have traditionally

[which the Convention seeks to protect] are based upon the existence of two facts, firstly, the existence of rights of custody attributed by the State of the child's habitual residence and, secondly, the actual exercise of such custody prior to the child's removal." See Elisa Perez-Vera, Explanatory Report: Hague Conference on Private International Law, in 3 Acts and Documents of the Fourteenth Session 426 (1980) (Perez-Vera Report) ¶ 64.  Here, it is undisputed that because the Parents were still married at the time of the retention, they shared joint custody rights, including the right to determine the Child's place of residence, under Japanese law.  Moreover, the Father does not deny that the Mother was exercising her rights of custody at the time of the retention.  As such, this case appears to fall squarely within the type of custodial relationship the Hague Convention seeks to protect.  See Lops v. Lops, 140 F.3d 927, 936 (11th Cir. 1998) ("The removal of a child from the country of his or her habitual residence is 'wrongful' under the Hague Convention if the petitioner 'is, or otherwise would have been, exercising custody rights to the child under that country's law at the moment of removal.'" (internal footnote omitted) (quoting Friedrich v. Friedrich, 78 F.3d 1060, 1064 (6th Cir. 1996)).

Nonetheless, the Father maintains that his retention of the Child did not "breach" the Mother's custody rights within the meaning of the Convention because his actions do

---

considered as aids to its interpretation the negotiating and drafting history . . . and the postratification understanding of the contracting parties.'" Id. (first, second and fourth alterations in original) (quoting Blondin v. Dubois, 189 F.3d 240, 246 n.5 (2d Cir. 1999)).  Although it is unclear whether this Report is entitled to any greater weight than a scholarly commentary, see Abbott v. Abbott, 560 U.S. 1, 19 (2010), the Court notes that the Perez-Vera Report is widely cited by the Courts of Appeal in this circuit and others when interpreting and analyzing the meaning of the Convention.  See, e.g., Robert v. Tesson, 507 F.3d 981, 988 n.3 (6th Cir. 2007) ("Many circuits hold Professor Elisa Perez-Vera's report to be an authoritative source for interpreting the Convention's provisions, and indeed the Hague Convention itself recognized Perez-Vera's report as official commentary." (internal citations omitted)); Shalit v. Coppe, 182 F.3d 1124, 1128 (9th Cir. 1999).

not constitute a "violation" of the Mother's custody rights under Japanese law.  Specifically, the Father offers expert testimony that in Japan, when parents have joint custody rights, one parent's decision to unilaterally take his or her child from the other parent does not "violate" the other parent's rights under Japanese law.  According to the Father's Japanese law experts, married parents generally do not have "rights of custody" that can be enforced against each other.  Specifically, Japanese attorney Eriko Matsuno testified that absent "an agreement between the parents or a court order, a parent can exercise parental authority over a child to the exclusion of the other parent," and Japanese courts would normally not consider this exclusion to be "unlawful."  See Resp.'s Ex. 97: Declaration of Eriko Matsuno, Esq. (Matsuno Decl.) ¶ 18; see also id. ¶ 14 ("[A] parent can exercise parental authority over a child to the exclusion of the other parent without violating any 'rights' of the excluded parent."); Resp.'s Ex. 93: Declaration of Colin Patrick Alan Jones (Jones Decl.) at 4 ("[T]o my knowledge there are no provisions of Japanese law that clearly define the taking or retention of a child or denial of access as between married parents to be a crime or otherwise unlawful without special circumstances being applicable, such as the existence of a court order, the use of force or danger to the child.").  According to Matsuno, the remedy for the left-behind parent in such a situation is to seek a court order, and while a Japanese court may order the return of the child, this is "not because the judge finds the abduction is violating the rights of the left behind parent."  See Matsuno Decl. ¶ 18.  Thus, because "parental abduction," i.e., one married parent taking a child from the other parent without his or her consent, is not "illegal" in Japan, Matsuno concludes that the Father's actions in taking the Child from the Mother by way of law enforcement and state court

orders did not "violate" the Mother's custody rights.  Id. ¶¶ 22-23; see also Jones Decl., Ex. C at 8 ("[I]t is difficult if not impossible to assert a breach of 'rights of custody' . . . under Japanese law for Convention purposes in cases where a child is allegedly taken to or retained in a foreign jurisdiction in a case where the parents are still married under Japanese law and no court orders are in place.").

Significantly, Matsuno qualified her analysis by explaining that it was based on domestic parental abductions.  When asked specifically about international abductions, Matsuno opined that if a married parent removes a child outside of Japan, then the Hague Convention would apply and in her opinion, the move would be illegal.  But see Jones Decl., Ex. C at 19.[30]  Likewise, Matsuno acknowledged that retaining a child abroad in violation of an agreement to return the child to Japan would also be illegal under Japanese law.  Matsuno explained that although Japanese custody law has not actually changed since Japan joined the Hague Convention, in light of Japan's implementation of the Hague Convention, an international abduction or retention would be deemed "illegal" under Japanese law if done in contravention of the Convention.  Nonetheless, Matsuno testified that she does not view the retention in this case as unlawful because the Father received the Child through law enforcement.  Because Japanese law provides that parents who

---

[30] In his report, Jones concludes that "in a case where the parents are still married, the child is not in an unsafe or inappropriate environment and no court orders or formal agreements are in place, I believe it would be hard to identify actionable breaches of rights of custody or visitation under the Civil Code provisions identified by Petitioner in similar cases arising in a strictly domestic Japanese context."  See Jones Decl., Ex. C at 19 (emphasis added).  Jones then extrapolates that "[t]o recognize such rights for purposes of a Hague Convention case would in effect be to create a new version of Japanese custody and visitation law having theoretical roots in the Civil Code but which only has life in practice when recognized and applied by foreign courts deciding such cases."  Id.  Notably, the Mother's Japanese attorney, Masanori Takeda, testified to his opinion on Japanese law and stated that he disagreed with the conclusions of Matsuno and Jones because their interpretation "would create an unwarranted exception to the Hague Convention by Japan."  See Pet.'s Ex. 38: Declaration of Masanori Takeda, Esq. (Takeda Decl.) ¶ 9.

disagree on custody must seek a court order, it is Matsuno's opinion that the Father's retention of the Child pursuant to the actions of law enforcement and court orders is not improper under Japanese law.

Upon careful consideration, the Court determines that the opinions of the Japanese law experts are not determinative because a showing of illegality or unlawfulness is not what the Hague Convention requires.  See Ozaltin v. Ozaltin, 708 F.3d 355, 368-70 (2d Cir. 2013) ("[A] removal under the Hague Convention can still be 'wrongful' even if it is lawful.")  Indeed, the Father presents no legal authority for the proposition that to have "breached" the Mother's rights of custody within the meaning of the Hague Convention he must have committed acts which were "illegal" or "unlawful" under Japanese law. Significantly, the Hague Convention explicitly includes joint custody rights within its purview.  See Hague Convention, art. 3(a).  The Perez-Vera Report explains that, in order to protect such rights,

> from the Convention's standpoint, the removal of a child by one of the joint holders without the consent of the other, is equally wrongful, and this wrongfulness derives in this particular case, not from some action in breach of a particular law, but from the fact that such action has disregarded the rights of the other parent which are also protected by law, and has interfered with their normal exercise.

See Perez-Vera Report ¶ 71 (emphasis added).  Thus, even if the Father's actions are not considered "unlawful" under Japanese law,[31] by disregarding the Mother's jointly held

---

[31] Notably, as stated above, Matsuno testified that where a married parent retains a child abroad in violation of an agreement between the parents to return the Child, Japan would view this action as an illegal retention of the Child.  Because the Court finds that the Parents did have an agreement that the Mother and Child could return to Japan, it may be that Japan would view the Father's actions as unlawful.  Nonetheless, the Court makes no finding as to whether the Father's actions were actually "illegal" under Japanese law.  Indeed, this Court's role is not to resolve the merits of the underlying custody dispute.  Rather, the Court addresses

rights and interfering with their normal exercise, the Father effectuated a "wrongful retention" within the meaning of the Hague Convention.  See Ozaltin, 708 F.3d at 368-70 (citing Perez-Vera Report ¶ 71); see also Mozes, 239 F.3d at 1084 ("By seeking sole custody over the children outside their state of habitual residence then, [the father] 'disregarded the rights of the other parent which are also protected by law, and . . . interfered with their normal exercise.'" (citing Perez-Vera Report ¶ 71)).  Unlike cases where courts have found no breach of a petitioner's custody rights, here, the Father points to no Japanese law, order or agreement which terminated the Mother's co-equal right to determine the child's country of residence.  See Ozaltin, 708 F.3d at 370; cf. White v. White, 718 F.3d 300, 305 (4th Cir. 2013) (finding no breach of rights where father retained "parental authority" but Swiss court had awarded mother sole custody, which, under Swiss law, gave her the authority to move the child abroad without the father's consent); Shealy v. Shealy, 295 F.3d 1117, 1122-23 (10th Cir. 2002) (finding no breach of rights where father was exercising custody rights but interim court order in country of habitual residence gave the mother the right to remove the child without the father's consent under certain circumstances and the mother did so in accordance with that order).

---

the sole issue relevant to the Hague Convention—which country is entitled to resolve that dispute.  See Jenkins v. Jenkins, 569 F.3d 549, 555 (6th Cir. 2009) (explaining that the expert's opinion on how the laws in one country applied to the custody dispute "irrelevant to the question before the district court, i.e., the jurisdiction in which the custody award should be determined"); see also Barzilay v. Barzilay, 600 F.3d 912, 916-17 (8th Cir. 2010) ("The purpose of proceedings under the Hague Convention is thus not to establish or enforce custody rights, but only 'to provide for a reasoned determination of where jurisdiction over a custody dispute is properly placed.'" (internal quotation omitted)).  In this respect, the Court disagrees with Jones' assessment that application of the Hague Convention's return remedy in this case affords the Mother rights which do not exist in domestic Japanese custody disputes.  See Jones Decl., Ex. C at 19.  An order of return provides the Mother and Father with precisely the same right to relief they would have in a domestic abduction—the ability to seek a resolution of their custody dispute by a Japanese court.

Notably, the Ministry of Foreign Affairs (the Ministry), Japan's Central Authority for purposes of the Hague Convention, accepted the Mother's Application for Assistance in Child's Return (Application).  It is apparent the Ministry reviews such applications for compliance with Japanese law in that the Ministry initially informed the Mother that her Application may be defective for failure to show a wrongful retention.  See Takeda Decl. ¶¶ 4-5, Ex. B.  Indeed, the Japanese Act for Implementation of the Convention on the Civil Aspects of International Child Abduction (Implementation Act) provides that the Ministry

> shall dismiss an application for assistance in child's return to Japan if . . . [i]t is obvious that the applicant does not have the rights of custody with respect to the child pertaining to the application under the laws or regulations of Japan, or that said rights of custody are not breached by the removal or retention of the child pertaining to the application.

See id., Ex. C: Implementation Act, art. 13(vii).  After the Ministry informed the Mother of the potential defect, the Mother amended her Application to provide additional information establishing the Parents' agreement that the Mother could return to Japan with the Child, and the Ministry thereafter accepted the Application.  See Takeda Decl. ¶¶ 6-8, Ex. E; compare Resp.'s Ex. 67 (amended Application) with Pet.'s Ex. 40 (original Application). The Court notes that the Application included information as to the role of law enforcement and the Florida state courts in facilitating the Father's retention of the Child, and yet, contrary to the opinions of Respondents' Japanese law experts, the Ministry found the Mother's account adequately described a wrongful retention.  The Ministry's acceptance of the Application is persuasive evidence that the facts of this case demonstrate a breach of the Mother's custody rights under Japanese law.

Moreover, the Father's reliance on the state court orders to establish that his retention was not wrongful is unavailing.  Allowing the Father to retain the Child outside of her habitual residence solely because he obtained a custody order in the United States would reward precisely the conduct the Hague Convention seeks to deter.  See Mozes, 239 F.3d 1084 n.54 ("By seeking to have this [custody] determination made in the United States rather than in the country of the children's habitual residence, [the father] did precisely what the Convention was intended to prevent.").  To address the problem of international child abductions, the Hague Convention is premised on the principle that any dispute over custody rights "should take place before the competent authorities in the State where the child had its habitual residence prior to its removal . . . ."  See Perez-Vera Report ¶ 19; see also Nicolson, 605 F.3d at 106 ("The Convention, after all, confers the privilege of deciding custody on the state of habitual residence." (citing Hague Convention, arts. 1(b), 16, 19)).  The Convention aims to deter the "international forum shopping and gamesmanship" that occurs when a parent moves "a child to a new country in hopes of obtaining a more favorable custody determination from a different court."  Berezowsky v. Ojeda, 765 F.3d 456, 465 (5th Cir. 2014).  Indeed, the drafters of the Convention recognized that a common characteristic of international child abductions is that the abducting parent "claims that his action has been rendered lawful by the competent authorities of the State of refuge . . . ."  See Perez-Vera Report ¶ 16.  As such, to deter would-be abductors, the Convention operates to deprive their actions "'of any practical or juridical consequences.'"  See Barzilay, 600 F.3d at 916 (quoting Perez-Vera Report ¶ 16). Indeed, Article 17 provides that "[t]he sole fact that a decision relating to custody has been

given in or is entitled to recognition in the requested State shall not be a ground for refusing to return a child under this Convention." <u>See</u> Hague Convention, art. 17.[32]  As such, under the circumstances of this case, the existence of the state court orders has no impact on the "wrongful retention" analysis. <u>See</u> <u>Walker v. Walker</u>, 701 F.3d 1110, 1115-16 (7th Cir. 2012); <u>Barzilay</u>, 600 F.3d at 920; <u>Nicolson</u>, 605 F.3d at 106-09; <u>Whallon v. Lynn</u>, 230 F.3d 450, 459 (1st Cir. 2000); <u>Miltiadous v. Tetervak</u>, 686 F. Supp. 2d 544, 552-53 (E.D. Pa. 2010).

---

[32] Although Article 17 does allow "the judicial or administrative authorities of the requested State" to "take account of the reasons for that decision in applying this Convention," the circumstances here do not warrant enforcement of the state custody orders.  The Father argues that the Mother initiated and participated in these proceedings, was properly served with the Father's divorce petition, and voluntarily chose to return to Japan and abandon the case.  The Court disagrees with the Father's assessment.  The Mother sought relief from the state court only in an effort to have the Child immediately returned to her after the Mother was arrested. <u>See</u> Pet.'s Ex. 23.  Besides trying to forcefully remove the Child from the Father, who had just had her arrested for attempting that very thing, it is unclear what other option the Mother had.  Regardless, the Mother may pursue her remedies under both state law and the Hague Convention, <u>see</u> 22 U.S.C. § 9003(h), and as the state proceedings did not address the Mother's Hague Convention claims, she is not precluded from pursuing her Hague Convention remedies in this Court. <u>See</u> <u>Holder</u>, 305 F.3d at 865-66.  Moreover, it was the Father who initiated the divorce proceedings by filing a petition for divorce in which he sought sole custody of the Child. <u>See</u> Resp.'s Ex. 25.  In doing so, the Father prevented the Mother from returning to Japan with the Child, and obtained the procedural and jurisdictional advantage of having the custody dispute resolved in the United States.  Thus, the rationale for applying Article 17—to prevent abductors from being able to rely on "a decision obtained by an abductor in the country of refuge 'before the court had notice of the wrongful removal or retention'"—warrants its application in this case. <u>Cf.</u> <u>Shalit</u>, 182 F.3d at 1131 (quoting <u>Legal Analysis of the Hague Convention on the Civil Aspects of International Child Abduction</u>, 51 Fed. Reg. 10503, 10504 (1986))

     Respondents cite two cases to support their argument that the Father's retention of the Child was not wrongful in light of the state court orders. <u>See</u> Respondents' Trial Brief at 30 (citing <u>Meredith v. Meredith</u>, 759 F. Supp. 1432 (D. Ariz. 1991) and <u>Shalit</u>).  Neither case is applicable here.  In <u>Meredith</u>, the respondent had received sole custody of the child based on a court order in the country of habitual residence prior to the alleged wrongful removal. <u>See</u> <u>Meredith</u>, 759 F. Supp. at 1435-36.  In <u>Shalit</u>, petitioner alleged that the respondent was wrongfully retaining the child in the United States.  However, the respondent had sole custody of the child pursuant to divorce proceedings which took place in the United States years before the wrongful retention, while both the parents and the child were living in the United States.  Although the court found that the child's habitual residence had subsequently changed to Israel, there was no evidence that Israel would not honor the prior custody order based on Israel's conflict of laws rules, and no suggestion that the custody orders were obtained to gain a jurisdictional or procedural advantage.  As such, the court denied the petition for failure to show a retention in breach of the petitioner's custody rights. <u>See</u> <u>Shalit</u>, 182 F.3d at 1129-31.  As such, <u>Shalit</u> and <u>Meredith</u> are distinguishable from this case where the custody orders on which the Father relies were entered either after, or contemporaneously with, the alleged wrongful retention, in a country other than that of the Child's habitual residence.

The evidence presented at the evidentiary hearing establishes that the Child's habitual residence was Japan, the Parents had joint custody of the Child under Japanese law, when the Mother brought the Child to the United States the Parents shared a mutual understanding that if their attempted reconciliation failed the Mother and Child could return to Japan, and when the Mother expressed her intention to return to Japan with the Child, the Father changed his mind and refused to allow the Mother to take the Child back to Japan.  Such facts demonstrate a wrongful retention within the meaning of the Hague Convention, regardless of the means by which the Father accomplished the retention. Because it is Japan, as the country of habitual residence, and not the United States, that must resolve the custody dispute between the Parents, the Father's use of state custody proceedings to wrest physical possession of the Child from the Mother and retain the Child in the United States does not render his retention any less wrongful under the Convention.

## III.   Affirmative Defenses

### A.  Applicable Law

As stated above, the Hague Convention provides certain affirmative defenses to the return of a child.  See Baran, 526 F.3d at 1344-45.  "These affirmative defenses are to be narrowly construed to effectuate the purposes of the Convention and, even if proven, do not automatically preclude an order of return."  Id. at 1345.  Two of the defenses require proof by clear and convincing evidence:

> 1) that return would expose the child to a "grave risk" of "physical or psychological harm or otherwise place [the child] in an intolerable situation" and (2) that return of the child would not be permitted by "fundamental principles of the United States relating to the protection of human rights and fundamental freedoms."

Bader v. Kramer, 484 F.3d 666, 668 (4th Cir. 2007) (alteration in original) (quoting Miller v. Miller, 240 F.3d 392, 398 (4th Cir. 2001)).  The other two defenses may be established by a preponderance of the evidence:

> (1) that the petition for return was not filed within one year of the removal and the child is now well-settled in another country, and (2) that the petitioner was not actually exercising his custodial rights at the time of the removal or had consented to or acquiesced in the removal.

Id. at 668-69.  Here, Respondents assert three affirmative defenses: 1) that return of the Child poses a grave risk of physical or psychological harm to the Child, 2) that the Verified Petition was not filed within one year of the retention and the Child is now well-settled in the United States, and 3) that the Mother acquiesced in the retention.

### B. Analysis

#### i. Acquiescence

Although the Mother has established a prima facie case for return of the Child, the Court may decline to order the return if the Father establishes by a preponderance of the evidence that the Mother "had consented to or subsequently acquiesced in the removal or retention."  See Hague Convention, art. 13(a).  The defenses of consent or acquiescence are analytically distinct in that "[t]he consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention."  See Baxter v. Baxter, 423 F.3d 363, 371 (3d Cir. 2005).  The defense of "acquiescence has been held to require 'an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time.'" Id. (quoting Friedrich v. Friedrich, 78 F.3d 1060, 1070 (6th Cir.

1996)).   This inquiry turns on the subjective intent of the parent who is alleged to have acquiesced.  Id.

In this case, there is no evidence to suggest that the Mother made any formal renunciation of rights.  Rather, the Father argues that the Mother acted with a "consistent attitude of acquiescence" because she returned to Japan while the state custody proceedings were ongoing without telling anyone, and did not make any effort to contact or communicate with the Child until she filed the instant Petition almost a year later.  See Respondents' Trial Brief at 32-34.   Under the facts of this case, the Court finds the acquiescence defense is unavailing.  While the Father characterizes the Mother's return to Japan as abandonment of the Child, the Court disagrees.  The Mother had spoken with Japanese counsel, learned of her potential remedies under the Hague Convention, and filed an Application for the Return of the Child with the Japanese Central Authority. Although the Mother did have funds from the Father due to the Court-ordered temporary assistance payments, she nonetheless was living in a domestic violence shelter with her teenage son in a country where neither of them spoke the language or knew anyone.  The fact that when tragedy befell her twin brother the Mother decided to return to Japan with her son, abandon the custody proceedings, and place her hope for return of the Child in the Hague Convention does not demonstrate acquiescence within the narrow meaning of the Hague Convention.

Moreover, under the circumstances of this case, the Mother's failure to communicate with the Child does not establish an "attitude of acquiescence."  As stated above, the issue turns on the subjective intent of the Mother, and given that she was

pursuing the return of the Child through the Japanese Central Authority at the time, it cannot be said that she also subjectively accepted that the Child would remain permanently in the United States.  Although the Mother was not communicating with the young Child during this time, rather than indicative of her acquiescence, the Court finds this conduct more likely resulted from her belief that such an attempt would be futile in light of the age of the Child, the language barrier, and her contentious history with the Father and Grandmother.  Indeed, based on the Court's observation of her testimony, it is apparent that the Mother was traumatized by the events of October 10, 2015.  From the Mother's perspective, the infant Child was taken from her without warning, and, unable to communicate with the officer, she was arrested and spent four days in jail, in a foreign country, separated from her children.  Given that these events occurred at the hands of the Father and Grandmother, whether justified or not, the Mother's failure to reach out to the Father and Grandmother in the hopes that they would let her see or communicate with the Child does not demonstrate that she had acquiesced to their retention of the Child. Accordingly, the Court concludes that the acquiescence defense does not provide a basis for refusing to return the Child to her country of habitual residence.

### ii.  Grave Risk

The affirmative defense of grave risk of harm requires proof by clear and convincing evidence.  See Baran, 526 F.3d 1345.  "The exception has been held to apply in at least two sets of cases: 'when return of the child puts the child in imminent danger . . . e.g., returning the child to a zone of war, famine, or disease . . . [and in] cases of serious abuse or neglect, or extraordinary emotional dependence . . . ."  See Baxter, 423 F.3d at 373

(alterations in original).  "The gravity of a risk involves not only the probability of harm, but also the magnitude of the harm if the probability materializes."  <u>Van de Sande v. Van de Sande</u>, 431 F.3d 567, 570 (7th Cir. 2005).  "For the grave harm exception to apply, the respondent must cite specific evidence of potential harm <u>to</u> <u>the</u> <u>child</u> upon his return."  <u>Baxter</u>, 423 F.3d at 374.  (emphasis supplied).

The grave risk exception recognizes that "'the Convention's purposes [would] not . . . be furthered by forcing the return of children who were direct or indirect victims of domestic violence.'"  <u>See</u> <u>Simcox v. Simcox</u>, 511 F.3d 594, 604-05 (6th Cir. 2007) (alterations in original) (internal quotation omitted).  "Thus, while all jurists would agree that <u>some</u> level of domestic abuse will trigger the [grave risk] exception, the more difficult question is at precisely what level will return expose the child to a '<u>grave</u> risk' of harm or place the child in an '<u>intolerable</u> situation'?"  <u>Id.</u> at 605.  The United States Department of State has advised that, "'[t]he person opposing the child's return must show that the risk to the child is grave, not merely serious.'"  <u>Friedrich</u>, 78 F.3d at 1068 (quoting <u>Public Notice 957</u>, 51 Fed. Reg. 10494, 10510 (March 26, 1986)).  The State Department offers an example of an "intolerable situation" as one where a custodial parent sexually abuses the child.  <u>Id.</u> at 1068-69.  As such, "courts that have confronted abusive situations tend to refuse to order the return of the children, at least where the abuse could be characterized as very serious."  <u>Simcox</u>, 511 F.3d at 605 (collecting cases).  In contrast, "situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences" do not constitute a grave risk of harm under the Convention.  <u>See</u> <u>Blondin v. Dubois</u>, 238 F.3d 153, 162 (2d

Cir. 2001).   Thus, the harm must be "'a great deal more than minimal'" and must be "'something greater than would normally be expected on taking a child away from one parent and passing him [or her] to another.'   Courts are not to engage in a custody determination or to address such questions as who would be the better parent in the long run."   See Whallon, 230 F.3d at 459 (internal citation omitted) (quoting Walsh v. Walsh, 221 F.3d 204, 218 (1st Cir. 2000)).

The Father argues that the Mother poses a grave risk to the Child because she has a volatile personality, anger management problems and was physically abusive toward him, as well as her adult daughter.   The Father also asserts that the Mother engaged in self-mutilation as some sort of retaliation against the Father after a particularly vehement argument.   In addition, the Father points to the October 10, 2015 incident resulting in the Mother's arrest as evidence of her dangerous and violent behavior.    Upon due consideration, the Court finds that the Father's allegations, all denied by the Mother and supported only by his own self-serving testimony, are insufficient to meet the "clear and convincing" evidence standard.   See Dionysopoulou v. Papadoulis, No. 8:10-CV-2805-T-27MAP, 2010 WL 5439758, at *3 (M.D. Fla. Dec. 28, 2010); Morales v. Martinez (In re S.L.C.), 4 F. Supp. 3d 1338, 1350 (M.D. Fla. 2014).[33]   Although the Father testified that he

---

[33] To the extent the Father argues that the Child would face a "grave risk" of harm if returned to Japan because the Child is now settled in Florida and bonded with her Father, Grandmother and extended family, such considerations are "inapposite to the 'grave risk' determination."   See England v. England, 234 F.3d 268, 271-72 (5th Cir. 2000) (collecting cases); Friedrich, 78 F.3d at 1068 ("A removing parent must not be allowed to abduct a child and then-when brought to court-complain that the child has grown used to the surroundings to which they were abducted."); but see Blondin, 238 F.3d at 164-65 (finding that the district court properly considered whether the children were settled in their new environment as part of the grave risk analysis, but noting that "ordinary disruptions necessarily accompanying a move would not by themselves constitute such a risk").   However, even if the Court were to consider this evidence in its grave risk analysis,

reported the Mother's volatile behavior to the Army, he presents no documentation or third-party testimony to support this contention.   Notably, the Father testified that a coworker once heard one of the Mother's violent outbursts over the telephone and was so concerned that he reported the incident to his commanding officer, yet the Father fails to offer any testimony, even by way of declaration, from this potential corroborating witness.   Likewise, the Father testified that he told his squad leader who was with him at the time about the photographs of the Mother's self-harm, but does not offer any testimony from the squad leader to corroborate this account either.   Moreover, even if the Father's allegations of the Mother's violent temper against him are accpeted, the Father presents no clear and convincing evidence that the Mother is a danger to her Child.   The Father offers no objective evidence that the Mother was ever abusive to her elder daughter, and the Mother's teenage son denied that such abuse ever occurred.   Nor does the October 10, 2015 incident convince the Court of a "grave risk" of harm to the Child.   The Father's account of the Mother grabbing the Child by the head is not supported by the officer's report.   While the Mother may have grabbed the Child in an aggressive manner, this

---

Respondents have failed to present any evidence that under the circumstances of this case the Child's resettlement in Japan would cause significant psychological trauma. Cf. Blondin, 238 F.3d at 164-65 (finding grave risk of harm where removing children from safe environment would thwart their recovery from prior abuse by causing recurrence of traumatic stress disorder).  Likewise, the Father's insistence that he will lose custody of the Child if the Child is returned to Japan does not, standing alone, support a finding of "grave risk" of harm within the meaning of the Hague Convention. See Souratgar v. Lee, 720 F.3d 96, 106 (2d Cir. 2013) ("Since the Convention defers the determination of custody to courts in the country where the child habitually resides, it is quite conceivable that in some cases one or the other parent may lose legal custody after repatriation and be deprived of access to the child.  Thus, the possible loss of access by a parent to the child does not constitute a grave risk of harm per se for Article 13(b) purposes.").  Regardless, beyond counsel's unsupported arguments in Respondents' Trial Brief, the Father failed to present any evidence that under Japanese law he will inevitably lose custody.

isolated incident under extenuating circumstances, is insufficient to demonstrate a "grave risk" of harm to the Child.

### iii. Well-Settled

Respondents next contend that the Court should not order the return of the Child because the Child is settled in her current environment within the meaning of Article 12 of the Convention.  Pursuant to this provision of the Convention,

> a court is required to order return of a child who has been wrongfully removed unless the respondent shows that the petition for return of the child was filed more than one year from the date of the wrongful removal or retention.  Even if the petition has been filed more than one year after the abduction, a court is required to order return unless the respondent also shows that the child has become settled in his or her new environment.

See Furnes v. Reeves, 362 F.3d 702, 723 (11th Cir. 2004); see also Lops v. Lops, 140 F.3d 927, 945-46 (11th Cir. 1998).  Here, the parties dispute both whether the Petition was filed after the one-year time period, and whether the Child is "well-settled" within the meaning of the Convention.

The Mother filed the Petition on October 26, 2016.  Respondents contend that the retention occurred on October 10, 2015, when the Father initially took physical possession of the Child after the Mother was arrested.  In support, Respondents observe that the Mother's Application with the Japanese Central Authority identifies the date of retention as October 10, 2015.  See Resp.'s Ex. 67.  The Mother disagrees with the use of October 10, 2015, as the date of the retention because she regained physical custody of the Child on October 21, 2015.  The Mother maintains that the wrongful retention did not occur until October 28, 2015, when the Grandmother took custody of the Child pursuant to the order

52

of the state court, because the Mother has never regained physical custody of the Child since that time.

When faced with a dispute over when a retention occurred, courts generally analyze the date of retention by determining either the date when the petitioner becomes aware of the respondent's intention not to return the child, see Dietz v. Dietz, 349 F. App'x 930, 933 n.2 (5th Cir. 2009) (citing In re Ahumada Cabrera, 323 F. Supp. 2d 1303, 1312-13 (S.D. Fla. 2004)), or the date when the petitioner unequivocally communicated to the respondent his or her desire to regain custody, see Walker, 701 F.3d at 1118; Karkkainen, 445 F.3d at 290. Under this analysis, the Mother learned of the Father's intention not to allow the Child to return to Japan on October 10, 2015, when the Father sent her the text messages demanding that the Child stay with him. Moreover, the Father served the Mother with his divorce petition on October 21, 2015, which sought an order imposing a parenting plan wherein the Child "on a temporary and permanent basis . . . reside[s] solely with" the Father, and "[p]rohibiting the [Child] from leaving the United States." See Resp.'s Ex. at 25. Indeed, at the hearing on October 21, 2015, the state court entered an order prohibiting the Mother from removing the Child from that court's jurisdiction. Thus, as of October 21, 2015, the Mother was undoubtedly aware of the Father's intentions to keep the Child in the United States.

Nonetheless, the Mother asserts that because she regained physical possession of the Child on October 21, 2015, she had no remedy under the Hague Convention regardless of the state court's order preventing her from taking the Child back to Japan. In support, the Mother cites to Pielage v. McConnell, 516 F.3d 1282, 1289 (11th Cir. 2008), wherein

the Eleventh Circuit explained that: "the Hague Convention was meant to cover the situation where a child has been kept by another person away from the petitioner claiming rights under the Convention, not where the petitioner still retains the child but is prevented from removing him from the jurisdiction." Id.  However, the Court observes that in a subsequent, unpublished decision, the Eleventh Circuit found that a wrongful retention had occurred where a mother retained physical custody of the child but was prevented from returning to the child's habitual residence because the father had surreptitiously seized the child's passport.  See Sewald v. Resinger, No. 09-10563, 2009 WL 6767881, at *3 (11th Cir. 2009).  In Sewald, the Eleventh Circuit acknowledged the language in Pielage "which suggests that the Hague Convention has no application when physical care of the child is unchanged," but reasoned that it was not bound by that language.  See Sewald, 2009 WL 6767881, at *3.  The Sewald court explained that because "the Pielage court was deciding the case before it; it could not and did not make binding law beyond the factual basis of the case before it.  Pielage says little about the application of the Hague Convention to the materially distinguishable facts presented here." Id.  Given these seemingly contradictory decisions, the question of when the wrongful retention occurred, whether at the point when the Father prevented the Mother from leaving with the Child, or when the Mother actually lost physical custody of the Child, remains unclear.  However, because the Court finds, for the reasons set forth below, that the Child is not sufficiently "settled" in the United States to meet the requirements of this defense, the Court need not resolve the parties' dispute as to the date of retention.

Generally, courts consider the following factors in determining whether a child is settled in a new environment:

> "(1) the child's age; (2) the stability and duration of the child's residence in the new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular school activities, such as team sports, youth groups, or school clubs; and (6) the respondent's employment and financial stability."

Fuentes-Rangel v. Woodman, 617 F. App'x 920, 922 (11th Cir. 2015) (quoting In re B. Del C.S.B., 559 F.3d 999, 1009 (9th Cir. 2009)).   Courts also frequently consider the immigration status of the child and respondent as part of the well-settled analysis.  See Alcala v. Hernandez, 826 F.3d 161, 171-74 (4th Cir. 2016) (citing Lozano v. Alvarez, 697 F.3d 41, 57 (2d Cir. 2012)).   Nonetheless, "'well-settled' means more than having a comfortable material existence."  See Lops, 140 F.3d at 946; Lopez v. Alcala, 547 F. Supp. 2d 1255, 1259-60 (M.D. Fla. 2008).   Courts must "'look beyond a comfortable material existence and . . . consider the child's living environment, the involvement of the parents, active measures taken to conceal the child's whereabouts, and the possibility of prosecution for conduct concealing the child.'"  See Lopez, 547 F. Supp. 2d 1255, 1259-60 (M.D. Fla. 2008) (quoting In re Ahumada Cabrera, 323 F. Supp. 2d at 1314).  Indeed, courts must be careful not to allow the "settled" analysis to transform into "a consideration of a child's best interests."  See Alcala, 826 F.3d at 171.  Rather, "[a] court determining whether a child is settled must focus on the significance of the child's connections to her or his new environment; it should not compare the child's current situation with her or his prior situation or expected situation if returned."  Id.

Turning to the facts of this case, the Court observes that the Child has lived in the same residence with the Grandmother and the Child's grandfather since October 28, 2015, approximately one year at the time the Petition was filed.  Respondents have made no efforts to conceal the Child's whereabouts, there appears to be no threat of prosecution for their conduct, and both the Child and Respondents are United States citizens such that there is no risk of deportation.  In addition, the Father and the Grandmother appear to be financially stable.  However, to the extent Respondents offered evidence that the Child has her own, well-furnished room, and numerous toys, the Court gives little weight to this evidence as it establishes merely that the Child has a comfortable material existence in the care of her Grandmother.  The Child does not attend daycare and is primarily cared for by the Grandmother, although the Father calls frequently, and visits every one or two months.  On his visits, the Father assumes responsibility as the primary caregiver.  Based on the testimony of the Respondents, as well as that of the child psychologist, it is evident that the Child is a well-adjusted, happy and healthy toddler, who is significantly bonded to her Grandmother and Father.  In addition, the Child has aunts, uncles and cousins who live nearby, and she is attached to these relatives as well.  However, her attachment to the American side of her family has come at the cost of any relationship with her Japanese Mother, half-brother and half-sister.

Turning to the remaining factors of the well-settled analysis, the Court observes that the Child does not attend school, nor was there any evidence presented that the Child regularly participates in church or community activities.  It appears that the Child has not developed any friendships outside of her own family.  Of course, the Child's lack of any

significant ties to her community is not surprising given her young age.  Indeed, the Child is a mere eighteen months old.  Significantly, Respondents do not cite the Court to any authority in which a court has found that a child under the age of two years old was well-settled in her new environment.  Indeed, several courts have observed that "children of such tender years are too young 'to allow meaningful connections to the new environment to evolve.'"  See Moreno v. Martin, No. 08-cv-22432-CIV, 2008 WL 4716958, at *21 (S.D. Fla. Oct. 23, 2008) (collecting cases) (quoting In re Robinson, 983 F. Supp. 1339, 1345 (D. Colo. 1997)); see also Riley v. Gooch, Civ. No. 09-1019-PA, 2010 WL 373993, at *11 (D. Or. Jan. 29, 2010) (noting that the court was unable to find any case in which a court refused to return a two-year old child based on the well-settled defense).  Upon due consideration of the cases addressing this defense in the context of very young children, and in light of the evidence presented, the Court finds that Respondents fail to establish their well-settled defense by a preponderance of the evidence.  Although the Court acknowledges that the Child has lived in a stable home for over a year, and is significantly attached to her caregivers, the evidence falls short of demonstrating that this eighteen-month old toddler has substantial and meaningful connections to Florida.  See Habrzyk v. Habrzyk, 775 F. Supp. 2d 1054, 1066-68 (N.D. Ill. 2011) (rejecting well-settled defense where four-year old was living in a comfortable and stable home and had close relationships with her relatives, but no connections to community); Blanc v. Morgan, 721 F. Supp. 2d 749, 764 (W.D. Tenn. 2010) (finding four-year old child was not well-settled despite respondent's stable home and employment, and child's regular day care attendance, family vacations and bond with family because no substantial evidence of

child's ties to community); <u>Riley</u>, 2010 WL 373993, at *11 (declining to apply well-settled defense although child had lived in same residence with grandparents for a year, consistently attended day-care, spoke English and had close relationship with respondent-father, because child had not developed such significant connections to the United States that return would be harmfully disruptive).[34]  The Court emphasizes that this finding bears no reflection on the care shown to the Child by her Grandmother and Father during her time in the United States.  It is apparent to the Court that the Child is happy in her current home and developing appropriately for her age, and the Child will not doubt undergo a difficult period of adjustment upon her return to Japan.  Nonetheless, the Court has, as is required by the Hague Convention, carefully separated it's analysis of the well-settled defense from any inquiry into the "best interests" of the Child, and must conclude that the Hague Convention requires return of the Child in these circumstances.

## IV.    Conclusion

In light of the foregoing, the Court, recognizing that its decision will be exceedingly difficult for the Father and Grandmother, is compelled to order the prompt return of the

---

[34] Respondents cite <u>Muhlenkamp v. Blizzard</u>, 521 F. Supp. 2d 1140 (E.D. Wash. 2007) and <u>Stevens v. Stevens</u>, 499 F. Supp. 891 (E.D. Mich. 2007) in support of their contention that the well-settled defense can apply to very young children.  However, in both <u>Muhlenkamp</u> and <u>Stevens</u>, the children at issue were older than the Child here, three and two-and-half years old, respectively, and had developed ties to the outside community.  <u>See Muhlenkamp</u>, 521 F. Supp. 2d at 1152 (finding three-year old child settled because, <u>inter alia</u>, the child was performing above her age level in day care, had a "strong core of friends," and routinely attended community cultural events); <u>Stevens</u>, 499 F. Supp. 2d at 896 (finding respondent met burden of showing child well-settled because, <u>inter alia</u>, the child had lived at the same address for almost two years, attends a twice-weekly toddler program at the local library, and attends church regularly).  However, the Court finds those cases to be distinguishable in that the Child here is younger still, and appears to have no substantial ties to the community.

Child to Japan.[35]  In doing so, the Court must emphasize that this outcome is in no way a reflection on the care given to the Child by the Father and Grandmother.  The Child has received loving care during her time in the United States, appears to be thriving, and to have developed a strong bond with the Father, Grandmother, and her extended family.  As such, it is the undersigned's sincere hope that the parties will continue to communicate with each other and take whatever steps are necessary to facilitate an ongoing relationship between the Child and both of her parents.  Although much about the facts of this case remain murky, it is abundantly clear to the Court that all parties concerned love the Child. In reaching this conclusion, the Court echoes the sentiments of the Ninth Circuit in <u>Holder</u>:

> These cases are always heart-wrenching, and there is inevitably one party who is crushed by the outcome.  We cannot alleviate the parties' emotional trauma, but at a minimum we can hope to provide them and their children with a prompt resolution so that they can escape legal limbo.

<u>Holder</u>, 392 F.3d at 1023.   The Court has striven to handle this difficult matter as expeditiously as possible, keeping in mind the gravity of the issues and the importance of assuring fairness to all concerned.   In the end, the Court concludes that, in accordance with the provisions of the Hague Convention and ICARA, the Child must be returned to Japan to allow her country of habitual residence to resolve the ongoing custody dispute between the Parents.

---

[35] The Court notes that at the conclusion or her case-in-chief, the Mother made an <u>ore tenus</u> motion to grant the Petition, which the Court took under advisement at that time.  <u>See</u> Minute Entry (Doc. 54).  The Mother failed to identify any rule which authorizes such a motion given that the Respondents had not yet had the opportunity to present their case. As such, the Court finds the motion to be premature and due to be denied. During the hearing, the Court also took under advisement Respondents' <u>ore tenus</u> motion for judgment as a matter of law.  <u>See</u> Minute Entry (Doc. 56).  For the reasons set forth in this Order, the Court finds that the Petition is due to be granted and thus, will deny the Respondents' <u>ore tenus</u> motion.

Before ruling on the Petition, the Court must acknowledge the hard work and dedication of the lawyers for both sides.   Petitioner and Respondents were both represented by able counsel who undertook the representation with little notice on a pro bono basis.  Having done so, both expended significant time and resources on the matter and represented their respective clients admirably.  The Court thanks all counsel involved for their selfless service.

In accordance with the foregoing, it is

**ORDERED**:

1. Verified Petition for the Return of Minor Child Pursuant to International Treaty and Federal Statute and Request for Issuance of Show Cause Order (Doc. 1) is **GRANTED**.

2. Petitioner's <u>ore</u> <u>tenus</u> motion to grant the Petition (Doc. 54) is **DENIED.**

3. Respondents' <u>ore</u> <u>tenus</u> motion for judgment as a matter of law (Doc. 56) is **DENIED**.

4. Given the unique circumstances of this case, specifically, the tender age of the Child and her lack of contact with the Mother during her retention in the United States, the Court directs the parties, through counsel, to confer and reach an agreement regarding the details of the manner and means of Y.L.C.'s transition and return to Japan.  On or before **2:00 p.m. on Friday, February 24, 2017**, the

parties shall file a joint notice setting forth their proposed arrangements for return of the Child or informing the Court of their failure to reach an agreement.[36]

5. The travel restrictions set forth in the Stipulated Order (Doc. 12) shall remain in full force and effect until further order of this Court.  Respondents are cautioned that any attempt to circumvent the requirements of this Order or remove the Child from the jurisdiction of this Court will risk a finding of contempt of court and imposition of sanctions.

6. Petitioner shall have up to and including **March 3, 2017**, to file any motion to recover necessary expenses incurred in this action pursuant to 22 U.S.C. § 9007(b)(3).[37]

7. The Clerk of the Court is **directed** to immediately release the Child's passport to Petitioner or her counsel so that the Child may travel to Japan.

---

[36] It is the Court's hope that the parties can expeditiously reach an agreement which will provide the Child with an adequate period of adjustment to the custody of her Mother and a minimally disruptive transition to Japan.  The Child deserves nothing less than the parties' best efforts to set aside their history and work together to ensure a stable and supportive environment for the Child in Japan.  However, absent an agreement, it is the Court's intention to direct Respondents Glenda Cunningham and Terrence Cunningham to surrender custody of the Child, Y.L.C., to Petitioner Ryoko Cunningham or her designee no later than March 3, 2017, for return to Japan.

[37] Pursuant to 22 U.S.C. § 9007(b)(3):

> [a]ny court ordering the return of a child pursuant to an action brought under section [9003] of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate.

While the Court understands that the attorneys represented the parties in this case pro bono such that an award of legal fees is not warranted, Petitioner may seek to recover her necessary costs and expenses, including the transportation costs related to the return of the Child.

8.  The Clerk of the Court is further **directed** to enter judgment in accordance with this Order, but the case shall remain open pending further order directing how the Child is to be returned to Japan.

**DONE AND ORDERED** in Jacksonville, Florida, this 17th day of February, 2017.

**MARCIA MORALES HOWARD**
United States District Judge

lc11
Copies to:

Counsel of Record

62